## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| LANITA CRISWELL and LASHEENA NEAL, on behalf of themselves and all others similarly situated,<br><br>                            Plaintiffs,<br><br>    v.<br><br>FROST BANK,<br><br>                            Defendant. | Civil Action No. 5:24-cv-327<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs LaNita Criswell and LaSheena Neal ("Plaintiffs"), on behalf of themselves and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding themselves and on information and belief as to others.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and on behalf of a Class of similarly situated consumers against Defendant Frost Bank ("Frost Bank") arising from Defendant's routine policy and practice of charging its customers Overdraft Fees ("OD Fees") on transactions that did not overdraw an account.

2.      The plain language of Frost Bank's adhesion contracts specifically promises that Frost Bank will only charge OD Fees on items when such items cause the account to have a negative balance.

3.      Overdraft fees represent one of the biggest profit centers for banks, stemming from practices susceptible to high levels of abuse which pose the largest burden on consumers. For example, investigations undertaken by the Consumer Financial Protection Bureau ("CFPB")

1

revealed that some banks intentionally create confusion for their accountholders regarding the terms of their overdraft policies, intentionally obscure how fees are charged for overdraft and insufficient funds transactions, and design their accountholder application and onboarding process to allow the banks to capitalize on this confusion. This confusion allows banks to maximize the number of overdraft fees they can charge leading directly to increased revenue for the bank. *See* Ashlee Kieler, *CFPB Says TCF Bank Made Millions From Misleading Overdraft Practices*, Consumerist.com (Jan. 19, 2017), https://consumerist.com/2017/01/19/cfpb-says-tcf-bank-made-millions-from-misleading-overdraft-practices/; *Consumer Financial Protection Bureau Orders Santander Bank to Pay $10 Million Fine for Illegal Overdraft Practices* (July 14, 2016), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-orders-santander-bank-pay-10-million-fine-illegal-overdraft-practices/.

4.      This increased revenue source has a disproportionate impact on consumers living in lower socioeconomic levels. As the Center for Responsible Lending reported, "[o]verdraft fees often impose a great burden on those already living paycheck to paycheck, struggling to make ends meet." *Center for Responsible Lending, Unfair Market: The State of High-Cost Overdraft Practices in 2017* (August 2018), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-unfair-market-overdraft-l-aug2018.pdf.

5.      Historically, overdraft fees represent a substantial revenue generator for financial institutions. In 2013 alone, a survey by Moebs Services, Inc. found that certain financial institutions generated $31.9 billion in overdraft revenue.[1] As banks continued their abusive

---

[1] *See* How Banks Sell Overdraft 1 (July 2014) (available at http://calreinvest.org/wp-content/uploads/2018/09/Report_How_Banks_Sell_Overdraft_Results_of_Overdraft_Mystery_Shopping_in_Four_Key_States.pdf).

practices of pushing overdraft products, "the Federal Reserve Board enacted certain regulatory changes in 2009, including requiring that bank customers must 'opt in' to bank overdraft products that may be triggered by ATM withdrawals or debit card purchases."[2] These regulations were specifically designed to protect consumers from abusive and confusing banking practices.

6.      Recently, one of the nation's largest banks, Ally Financial, announced that it was eliminating overdraft fees on all accounts. Ally's CEO stated in the company's announcement that "[n]ationwide, more than 80% of overdraft fees are paid by consumers living paycheck to paycheck or with consistently low balances – precisely the people who need help stabilizing their finances…[e]liminating these fees helps keep people from falling further behind and feeling penalized as they catch up." Jessica Dickler, *Ally Bank is Eliminating Overdraft Fees Once and For All*, CNBC (June 2, 2021), https://www.cnbc.com/2021/06/02/ally-bank-eliminates-overdraft-fees-for-all-customers.html.

7.      Plaintiffs and other Frost Bank customers have been injured by Frost Bank's practices. On behalf of themselves and the putative class, Plaintiffs seek damages and restitution for Frost Bank's breach of contract.

## PARTIES

8.      Plaintiff Criswell is a Texas citizen and resides and is domiciled in San Antonio, Texas, Bexar County.

9.      Plaintiff Neal is a Texas citizen and resides and is domiciled in San Antonio, Texas, Bexar County.

10.     Frost is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative Class. Frost is a Texas state charted bank and has

---

[2] *Id.*

its headquarters in San Antonio, Texas. Frost has almost $50 billion in assets and provides services to customers through branches in Texas.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

   a.  the proposed Class is comprised of at least 100 members; § 1332(d)(5)(B)

   b.  upon information and belief, at least one member of the proposed class is a citizen of a State other than Texas (the State of which Frost Bank is a citizen), § 1332(d)(2)(A); and

   c.  the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. § 1332(d)(2), (6).

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Frost Bank is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.    DEFENDANT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

13.     Plaintiffs bring this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as Authorize Positive, Purportedly Settle Negative Transactions, or "APPSN Transactions."

14.     Here's how it works: at the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover

that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Defendant has already sequestered these funds for payment.

15.    However, Defendant still assesses crippling $35 OD Fees on many of these transactions and mispresents its practices in its Account Contract.

16.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN transactions.

17.    Defendant maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

18.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which

may be up to three days after authorization, those funds may be unavailable for the
consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,

Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

19.     That means when any subsequent, intervening transactions are initiated on a
checking account, they are compared against an account balance that has already been reduced to
account for the earlier debit card transactions. This means that many subsequent transactions incur
OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, Defendant
improperly charges OD Fees on those APPSN Transactions, notwithstanding that the APPSN
transactions always have sufficient available funds to be "covered."

21.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed
concern with this very issue, flatly calling the practice "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a
> customer's available balance but did not result in an overdraft at the time of
> authorization; settlement of a subsequent unrelated transaction that further lowered
> the customer's available balance and pushed the account into overdraft status; and
> when the original electronic transaction was later presented for settlement, because
> of the intervening transaction and overdraft fee, the electronic transaction also
> posted as an overdraft and an additional overdraft fee was charged. Because such
> fees caused harm to consumers, one or more supervised entities were found to have
> acted unfairly when they charged fees in the manner described above. Consumers
> likely had no reason to anticipate this practice, which was not appropriately
> disclosed. They therefore could not reasonably avoid incurring the overdraft fees
> charged. Consistent with the deception findings summarized above, examiners
> found that the failure to properly disclose the practice of charging overdraft fees in
> these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the
> disclosure of overdraft processing logic for electronic transactions. Examiners

noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 Supervisory Highlights, 8–9 (available at

https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf).

22.     The CFPB recently released additional critique of this exact practice:

Unanticipated overdraft fees can occur on "authorize positive, settle negative" or APSN transactions, when financial institutions assess an overdraft fee for a debit card transaction where the consumer had sufficient available balance in their account to cover the transaction at the time the consumer initiated the transaction and the financial institution authorized it, but due to intervening authorizations, settlement of other transactions (including the ordering in which transactions are settled), or other complex processes, the financial institution determined that the consumer's balance was insufficient at the time of settlement. These unanticipated overdraft fees are assessed on consumers who are opted in to overdraft coverage for one-time debit card and ATM transactions, but they likely did not expect overdraft fees for these transactions.
 …

Certain financial institution practices can exacerbate the injury from unanticipated overdraft fees from APSN transactions by assessing overdraft fees in excess of the number of transactions for which the account lacked sufficient funds. In these APSN situations, financial institutions assess overdraft fees at the time of settlement based on the consumer's available balance reduced by debit holds, rather than the consumer's ledger balance, leading to consumers being assessed multiple overdraft fees when they may reasonably have expected only one.

Consumer    Financial    Protection    Bureau,    Circular    2022-06,    October    26,    2022,

https://files.consumerfinance.gov/f/documents/cfpb_unanticipated-overdraft-fee-assessment-practices_circular_2022-10.pdf, pp. 8-9, 10 (last accessed November 2, 2022).

23.     There is no justification for these practices, other than to maximize Defendant's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Defendant was not content with these millions in OD Fees. Instead it sought millions *more* in OD Fees on these APPSN Transactions.

24.     This abusive practice is not universal in the banking industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—do not charge OD Fees on APPSN transactions.

25.     These practices breach contractual promises made in Defendant's Account Contract—a contract which fundamentally misconstrues and misleads consumers about the true nature of Defendant's processes and practices. These practices also exploit contractual discretion to gouge consumers.

26.     In plain, clear, and simple language, Defendant's Account Contract promises that Defendant will only charge OD Fees on transactions that have insufficient funds to "cover" that transaction.

27.     Defendant is therefore not authorized by the Account Contract to charge OD Fees on transactions that have not overdrawn an account, but Defendant has done so and continues to do so in violation of the Account Contract.

A.  **MECHANICS OF A DEBIT CARD TRANSACTION**

28.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

29.     At this step, if the transaction is approved, Defendant immediately decreases the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet *transfer* the funds to the merchant.

30.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

31.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account. This is referred to in the banking industry as "posting" or "settling"— something which may occur several days after the transaction was initially initiated.

32.     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized

occurs. That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

## B.  **DEFENDANT CHARGES ITS CUSTOMERS FEES IN EXCESS OF THOSE PROVIDED FOR IN THE ACCOUNT CONTRACT.**

### i.  **Defendant's Account Contract**

33.     Plaintiffs have a Frost Bank checking account, which is governed by Frost's Deposit Account Agreement ("Account Agreement") and Fee Schedule, attached hereto as *Exhibits A* and *B*, respectively.

34.     After defining an overdraft as an "event that results in a negative balance to your Account," Ex. A at 2, the Account Agreement states in pertinent part:

**Withdrawal Restrictions and Overdrafts** – We are not obligated to allow you to make a withdrawal from your Account if you don't have sufficient available funds in the Account to cover the full amount of the withdrawal. If there are available funds to cover some, but not all, of the withdrawals or other debits (such as charges) to your Account, we post those withdrawals in the manner described in this section. The manner in which we process withdrawals or other debits may affect the amount of overdraft or non-sufficient funds charges or penalties you may incur. We establish different categories of withdrawals or other debits to your Account for this purpose. For example, we process ATM and debit card transactions, teller withdrawals and loan payments payable to us before checks. Within each category, we currently process withdrawals for that category in the following manner:

- *For ATM and debit card transactions, provided that such ATM or point-of-sale terminal or network is properly operating, we process such transactions as they are received by us*

- *For ATM and debit card re-presented transactions, and for all other items for which authorization has already occurred, we process such transactions from the lowest dollar amount to the highest dollar amount*

[ . . . ]

**We may change the categories or the processing order of one or more of the categories at any time without notice to you, provided that such categories and processing order comply with applicable law, rule or regulation.** *If there are insufficient available funds to cover some of the withdrawals or debits presented against your Account, such items will be handled in accordance with our overdraft*

*procedures* or any other agreement you may have with us (such as an Overdraft Protection Agreement). Even if we choose to pay one or more overdrafts, we are not obligated to cover any future overdrafts. *We may determine the balance of your Account in connection with determining whether payment of an item will create an overdraft at any time between the earlier of: (1) the time the item is presented to us for payment (by electronic or other means) or the time we receive notification that the item has been deposited for collection in another financial institution; and (2) the deadline for us to take action on the item.* We are not required to determine your Account balance more than one (1) time during this period. *A per item service charge may be assessed on any item that will overdraw the available Account balance, regardless of whether we pay or dishonor (i.e., return) the item.* You agree immediately upon notice from us to deposit funds sufficient to cover any overdraft plus service charges, if required. We will not be liable for the dishonor of any item when the dishonor occurs because we setoff a debt against your Account. We also may refuse to allow a withdrawal if there is a dispute about the Account (unless a court has ordered us to allow the withdrawal), the Account is garnished or attached, the Account has been pledged as collateral for a debt, the availability of the funds on deposit cannot be verified, any required documentation has not been presented, or you fail to repay an obligation to us on time.

Ex. A at 16-18 (bold in original and emphasis added in italics).

35.     Frost's Fee Schedule states that it charges $35 OD Fee for each item overdrafted. *See Exhibit B.*

36.     Consistent with its Account Agreement, an overdraft occurs when a customer does not have enough money in their account to cover a transaction, but Frost pays it anyway.

37.     Frost's APPSN gimmick also breached Frost's required Regulation E Opt-In Contract, which Frost's titles, "What You Need to Know About Overdrafts and Overdraft Fees." It states: "An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *See Exhibit C* (emphasis in original).[3] When Frost engages in the APPSN gimmick, it is breaching this term, because it has set aside the money to pay for the transaction at issue when there was "enough money in [the] account to cover [the] transaction,"

---

[3] On information and belief, the language appearing in Exhibit C was used by Frost during the entire relevant period.

but then charges an overdraft fee on the transaction regardless.

38.     By utilizing an APPSN calculation Frost also violates the Opt-In Contract provision, which states that authorization and payment of items is a coterminous event. The Opt-In Contract repeats "authorize and pay" several times throughout the Opt-In Contract, including in the instructions to opt-in: "If you also want us to *authorize and pay* overdrafts on your everyday debit card transactions." *Id.* (emphasis added).

39.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Defendant assesses OD Fees on them anyway.

40.     These promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

41.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "pay" those same transactions when they settle. Instead, it uses a secret posting process described below.

42.     All these representations and contractual promises are untrue. In fact, Defendant charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in the Account Contract states that Defendant may impose OD Fees on *any* APPSN Transactions.

43.     The Account Contract misrepresents Defendant's true debit card processing and overdraft practices.

44.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite

affirmative contractual representations that Defendant will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

45.     Defendant assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

46.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Defendant's actual practice and the contract causes consumers like Plaintiffs to incur more OD Fees than they should.

47.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

48.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batching posting process.

49.     In reality, Defendant's actual practice is to inspect the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

50.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Defendant cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

51.     This discrepancy between Defendant's actual practices and the Account Contract causes consumers to incur more OD Fees than they should.

52.     In sum, there is a huge gap between Defendant's practices as described in the Account Contract and Defendant's practices in reality.

### ii.     Defendant Abuses Contractual Discretion

53.     Defendant's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Defendant exploits contractual discretion to the detriment of accountholders when it uses these policies.

54.     Moreover, Defendant uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

55.     Defendant uses its contractual discretion unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees, to its own benefit and to the detriment of its customers.

### iii.     Plaintiffs' Experiences.

56.     In January 2021, Plaintiff Criswell was assessed OD Fees in the amount of $35 for debit card transactions that settled on that day even though positive funds were deducted and held immediately for the transaction on which he was assessed an OD Fee.

57.     In January of 2023, Plaintiff Neal was assessed OD Fees in the amount of $35 for debit card transactions that settled on that day even though positive funds were deducted and held immediately for the transaction on which he was assessed an OD Fee.

### CLASS ALLEGATIONS

58.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements. The proposed Class is defined as follows:

> All Frost Bank checking account holders who, during the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance.

59.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

60.     Excluded from the Class are Frost Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which Frost Bank has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

61.     The members of the Class are so numerous that joinder is impractical.  The Class consist of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained with reference to, Frost Bank's records.

62.     The claims of the representative Plaintiffs are typical of the claims of the Class they seek to represent in that the representative Plaintiffs, like all Class members, were charged improper and deceptive fees as alleged herein. The representative Plaintiffs, like all Class members, were damaged by Frost Bank's misconduct in that they were assessed OD Fees on APPSN transactions. Furthermore, the factual basis of Frost Bank's misconduct is common to all Class members and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class. Frost Bank has no unique defenses that would apply to Plaintiffs and not the Class such that Plaintiffs' claims would be rendered atypical within the meaning of Rule 23(a)(3).

63.     There are numerous questions of law and fact common to the Class and those

common questions predominate over any questions affecting only individual members of the Class.

64.     The questions of law and fact common to the Class include, but are not limited to, the following:

a.      Whether Frost Bank's assessment of OD Fees on APPSN transactions constituted a breach of its form contractual terms;

b.      Whether Frost Bank's assessment of OD Fees on APPSN transactions violated Regulation E;

c.      Whether Frost Bank's assessment of OD Fees on APPSN transactions was in violation of its covenant of good faith and fair dealing;

d.      The proper method or methods by which to measure damages and/or restitution and/or disgorgement; and

e.      Whether Plaintiffs and the Class are entitled to declaratory and injunctive relief and the nature of that relief.

65.     Plaintiffs' claims are typical of the claims of other members of the Class, in that they arise out of the same wrongful OD Fee policies and practices. Plaintiffs have suffered the harm alleged and possess no interests antagonistic to the interests of any other Class member.

66.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, consumer class actions against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

67.     A class adjudication is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual member of the Class'

claim is small relative to the complexity of the litigation, and due to the financial resources of Frost Bank, no member of the Class could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the members of the Class will continue to suffer losses and Frost Bank's misconduct will proceed without remedy.

68.     Even if members of the Class could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly and unnecessarily increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

69.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

70.     Frost Bank has acted or refused to act on grounds generally applicable to each of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

71.     All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Implied Covenant**
**(On Behalf of Plaintiffs and the Class)**

72.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

73.     Plaintiffs and Frost Bank have contracted for bank account deposit, checking,

ATM, and debit card services. That contract does not permit Frost Bank to charge OD Fees on APPSN transactions.

74.     Nowhere in the Account Agreement did Frost Bank state that it would charge OD Fees on APPSN transactions.

75.     Good faith is an element of every contract. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

76.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, interference with or failure to cooperate in the other party's performance, or use of contractual discretion in a manner evincing a lack of good faith and fair dealing, such as consistently utilizing any such discretion to the breaching party's own benefit and to the nonbreaching party's detriment.

77.     Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

78.     Plaintiffs and members of the Class have sustained damages as a result of Frost Bank's breach of the contract.

## SECOND CLAIM FOR RELIEF
## Violation of the EFTA (Regulation E), 12 C.F.R. § 1005, *et seq.*;
## Authority Derived From 15 U.S.C. § 1693, *et seq.*
### (On behalf Plaintiffs and the Class)

79.     The allegations contained in Paragraphs 1-71 are incorporated by reference and re-alleged as if fully set forth herein.

80.     Defendant charged Plaintiffs overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance.

81.     Defendant failed to provide Plaintiffs disclosures that fully and accurately described Defendant's overdraft service – i.e., the service under which Defendant would assess overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance. Specifically, prior to enrolling Plaintiffs in the service and charging Plaintiffs overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance, Defendant failed to provide Plaintiffs a segregated, non-misleading and truthful description of its practices, as part of the overdraft service, in assessing overdraft fees as a result of one-time debit card transactions, as required by 12 C.F.R. § 1005.17.

82.     Plaintiffs was assessed overdraft fees as a result of debit card transactions being authorized into a positive balance, without their informed, affirmative and written consent, in violation of Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

83.     Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and all members of the Class are entitled to, and do seek, actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

1.      Declaring Frost Bank's policies and practices as described herein to be wrongful, unfair, and unconscionable;

2.      Restitution of all amounts paid to Frost Bank by Plaintiffs and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by Frost Bank from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Treble damages pursuant to applicable law and in an amount according to proof;

6.      Punitive and exemplary damages;

7.      Pre-judgment interest at the maximum rate permitted by applicable law;

8.      Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

Date: April 1, 2024                                    Respectfully submitted,

                                                       By: */s/ Andrew Shamis*
                                                       Andrew Shamis
                                                       Edwin E. Elliott (pro hac vice forthcoming)
                                                       **SHAMIS & GENTILE, P.A.**
                                                       14 NE 1st Avenue, Suite 705

Miami, FL 33132
(305) 479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com


Jacob Phillips (pro hac vice forthcoming)
Joshua Jacobson (pro hac vice forthcoming)
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
(407) 720-4057
jacob@jacobsonphillips.com
joshua@jacobsonphillips.com


Jeffrey D. Kaliel (pro hac vice forthcoming)
Sophia G. Gold (pro hac vice forthcoming)
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
(202) 350-4783
jkaliel@kalielgold.com
sgold@kalielgold.com


Scott Edelsberg (pro hac vice forthcoming)
**EDELSBERG LAW, P.A.**
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com


*Counsel for Plaintiffs and the Proposed Class*