EXHIBIT A

Case No.: 5:24-cv-327

The Wayback Machine - https://web.archive.org/web/20210518083913/https://www.frostbank.com/agreements-disclosures/deposit-account-agreement-other-disclosures

# DEPOSIT ACCOUNT AGREEMENT AND OTHER DISCLOSURES

Effective July 1, 2020

Member FDIC

I. INTRODUCTION

II. DEFINITIONS

III. THE AGREEMENT FOR YOUR ACCOUNT
    A. Governing Law; Dispute Resolution; Arbitration; Statute of Limitations
    B. Systems and Software
    C. Fraud and Loss Prevention; Legal Process; Legal Compliance; Reservation of Rights
    D. Account Termination
    E. Assignability
    F. Frost Bank Property, Branch and ATM Code of Conduct

IV. INFORMATION ABOUT YOU AND YOUR ACCOUNT
    A. Credit Verification and Reporting
    B. Notify Us of Inaccurate Information We Report to Consumer Reporting Agencies
    C. Consent to Autodialed and Prerecorded Phone Calls and Text Messages; Consent to Fraud Alert Text
    Messages and Email Communications; Consent to Geo-Location Based Fraud Prevention

V. OUR COMMITMENT TO SECURITY
    A. Debit Card Services (Including Health Savings Account Debit Cards)
    B. Frost Online Banking Services for Personal and Business Accounts
    C. Mobile Device and Wireless Internet Access

VI. DEPOSIT ACCOUNTS
    A. Interest
        (1) Payment of Interest
        (2) Minimum Balance Requirements
        (3) Initial Interest Rate
        (4) Changes
    B. Fees and Charges
    C. Funds Availability Policy Disclosure
        (1) Your Ability to Withdraw Funds
        (2) Longer Delays May Apply
        (3) Holds on Other Funds (Check Cashing)
        (4) Holds on Other Funds (Other Accounts)
    D. Deposit Rules
        (1) Endorsements
        (2) Final Payment
        (3) Certain Direct Deposits
        (4) Remotely Created Checks
        (5) Foreign Items
        (6) Our Right to Refuse Deposits
        (7) Adjustments and Receipts
        (8) Our Responsibility for Collecting Deposits
    E. Withdrawal Rules
        (1) Manner of Withdrawal
        (2) Withdrawal Restrictions and Overdrafts
        (3) Notice Requirements
        (4) Postdated Items
        (5) Stale Checks
        (6) Power of Attorney
        (7) Agents

(8) Signatures
(9) Multiple Signatures
(10) Facsimile Signatures
(11) Preauthorized Drafts
(12) Converting Checks To Electronic Debits
(13) Re-presented Checks
(14) Electronic Checks
(15) Check Legends
F. Checking Subaccounts
G. Interest-Bearing Checking Accounts
H. Stop Payment Orders for Checks
I. Types of Account Ownership
(1) Individual Accounts
(2) Multiple-Party Accounts
(3) Additional Account Types
J. Time Deposits
(1) Penalty
(2) Exceptions
K. Our Liability
L. Right of Setoff
M. Dormant Accounts
N. Account Statements
O. Positive Pay Services
P. Wire Transfers and Automated Clearing House (ACH) Transactions
(1) Provisional Payment
(2) Notice of Receipt
(3) Foreign Wires
Q. Cash Vault Services and Smart Safe Services
(1) Cash Vault Services
(2) Smart Safe Services
R. Notices
(1) Notice of Amendments
(2) Account Changes
(3) Delivery and Receipt of Notices

VII. DIGITAL DEPOSITS
A. Funds Availability Policy Disclosure
(1) Your Ability to Withdraw Funds
(2) Longer Delays May Apply
(3) Holds on Other Funds (Check Cashing)
(4) Holds on Other Funds (Other Accounts)
B. Information Regarding Digital Deposits
C. Representations and Agreements; Indemnity
D. Limitation on Liability
E. Security Procedures
F. Termination

VIII. DIGITAL WALLET SERVICE
A. Generally
B. Relationship to Your Digital Wallet Provider
C. Relationships to Other Frost Accounts
D. Eligibility
E. Device Eligibility
F. Use of Your Mobile Cards
G. Fees
H. Suspension; Cancellation
I. Electronic Contact
J. Data Privacy
K. Changes to Digital Wallet Service Terms
L. Disclaimer of Warranties
M. License for Any Mobile Card
N. Indemnification
O. Limitation of Liability
P. Your Responsibilities

IX. SUBSTITUTE CHECK POLICY DISCLOSURE
    A. Substitute Checks and Your Rights
        (1) What is a Substitute Check
        (2) What are Your Rights Regarding Substitute Checks
        (3) How Do You Make a Claim for a Refund
        (4) Substitute Checks Deposited by You


X. ELECTRONIC BANKING SERVICES
    A. Electronic Funds Transfers Generally
    B. Required Disclosures Under Electronic Funds Transfer Act and the Consumer Financial Protection
     Bureau's Regulation E
        (1) ATM and Debit Card Transfers and Limitations
        (2) General Information
        (3) Your Liability for Unauthorized Transfers
        (4) How to Notify Us
        (5) Error Resolution Procedures
        (6) Online Banking, Mobile Banking, and Bill Payment Services
        (7) Electronic Check Conversion
        (8) Represented Check Transaction
        (9) Fees
        (10) Stop Payments on ATM, POS, or Debit Card Transactions
        (11) Confidentiality
        (12) Documentation of Transfers
        (13) Preauthorized Payments


XI. IMPORTANT INFORMATION ABOUT CASH REPORTING REQUIREMENTS FOR BANKS UNDER THE BANK SECRECY ACT


XII. BUSINESS CONFIDENTIALITY STATEMENT

## I.
## INTRODUCTION

We are pleased to provide you with our Deposit Account Agreement (the "Agreement" as further defined below), which applies to any personal or business checking, savings, money market or CD account (each either a "Personal Account" or a "Business Account" as defined below) you may have with Frost Bank. We urge you to carefully read the Agreement and keep it for future reference. We are here to answer any questions you may have about this Agreement or about your Frost Bank Account(s). Please feel free to call us at 1-800-513-7678.

In this Agreement, each and all of the depositors may be referred to as "you," "your," "Account Holder" or "customer." Frost Bank may also be referred to as "Frost," "Bank," "we," "our," and "us." "Party" refers to either you, your agent under any Power of Attorney, or Frost, as the case may be, and "Parties" refers collectively to both you, your agent(s) under any Power of Attorney, and Frost. This Agreement contains the general terms and conditions governing your deposit Accounts with us. The term "Agreement" includes this document, the Account signature card and all signature card addenda ("Signature Card"), Truth in Savings disclosures and other Schedules, and any other agreement, as amended from time to time, that is applicable to the specific type of Account you open that we provide to you, including, but not limited to: the Frost Online Banking Agreement and Disclosure (which includes optional Mobile Banking Services); the Treasury Management Services Agreement; the Personal and Health Savings Account Debit Card Agreement and Disclosure (or other similar agreement);  the Business Debit Card Agreement and Disclosure (or other similar agreement); and the Electronic Funds Transfer Agreement and Disclosure.  Each of you signing the Signature Card for an Account acknowledges receipt of this Agreement, and agrees to the terms set forth in the Agreement, as amended from time to time. This Agreement will be binding on your personal representatives, authorized agents, executors, administrators, and successors, and on our successors and assigns. You agree that we may, in our sole discretion, waive any fee, charge, term, or condition set forth in this Agreement at the time the Account is opened or later, on a one-time basis or for any period, without changing the terms of the Agreement or your obligation to be bound by the Agreement, and we need not provide similar waivers in the future or waive our rights to enforce the terms of this Agreement. This Agreement, together with specific terms and conditions governing your Account(s), provided separately, details our relationship with you. Please carefully read this Agreement and other related Account and Frost Bank documents, and save them for future reference.

## II.
## DEFINITIONS

Below are definitions of some important terms used throughout this Agreement:

A.   "**Available Balance**" means the balance in your Account after deducting (i) deposits that are not yet eligible for withdrawal

under our funds availability rules, (ii) debit card, electronic payments or other transactions that we are legally obligated to pay or have already paid (in cash or otherwise), (iii) other pending transactions such as ACH transactions, (iv) any funds that are subject to final payment, and (v) any holds on your Account, such as holds on funds to comply with court orders or other legal requirements.

B.    "**Average Daily Balance**" means the application of a periodic rate to the Average Daily Balance in the Account for the period, determined by adding the full amount of principal in the Account for each day of the period and dividing that figure by the number of days in the period.

C.    "**Business Account**" means any Account that is not used primarily for personal, family or household purposes.

D.    "**Business Days**" means Monday through Friday, excluding federal holidays.

E.    "**Check**" or "**check**" means any written order to pay a specific amount of money drawn on, payable through or at, or processed by, a bank or other depository institution. If a check is sent or returned as an electronic image or as a Substitute Check, it is still considered a check.

F.    "**Current Balance**" means the balance of transactions that have cleared to date. It does not include transactions you may have initiated that have not yet cleared, such as checks you may have written but did not present to Frost.

G.    "**Daily Balance**" means the application of a daily periodic rate to the full amount of principal in the Account each day.

H.    "**Debit Card**" refers to your Personal Debit Card, Health Savings Account Debit Card, or Business Debit Card.

I.    "**Hold**" means any funds that are in your Account but that you cannot withdraw because of delayed funds availability, Legal Process or other reasons as set forth in this Agreement.

J.    "**Item**" means any check, ACH, funds transfer, teller cash withdrawal, ATM withdrawal, debit card purchase, fee, charge, or other amount that is added to or subtracted from your Account.

K.    "**Legal Process**" includes, but is not limited to, a writ of attachment, execution, garnishment, tax withholding order, levy, restraining order, subpoena, warrant, injunction, government agency request for information or action, search warrant, forfeiture, or other similar order.

L.    "**Overdraft**" means any event that results in a negative balance to your Account.

M.    "**Personal Account**" means any Account with Frost Bank that is used primarily for personal, family or household purposes.

N.    "**Schedule**" refers to any document specifying rates, fees or transaction limits pertaining to the Account in question, including, but not limited to, a Truth in Savings, Time Certificate of Deposit, Confirmation of Time Deposit, or any schedule setting forth Frost fees, limits, or both.

O.    "**Security Procedures**" means any security processes, controls or authentication methods that the Bank may require for one or more of the products or services that Bank provides under this Agreement or under any other agreement, as amended from time to time, that is applicable to the specific type of Account you have, or specific type of product or service that we offer to you, and which may vary based upon your Account type or the products and services you choose to receive from us.

P.    "**Substitute Check**" means a paper reproduction of an Original Check with an accurate, legible image of the front and back of the Original Check, and that conforms to standards established by the Federal Reserve Board.

Q.    "**Unauthorized Transaction**" means a transaction that was not authorized by you, including, but not limited to, an erroneous or unauthorized debit. It might include a missing signature, an unauthorized signature, or an alteration, or be a transaction that was otherwise not authorized by you.

R.    "**Wire Transfer**" shall have the same meaning assigned to that term by Regulation CC.

Additional definitions regarding Digital Deposit terms are contained in Section VII (Digital Deposits).

III.
**THE AGREEMENT FOR YOUR ACCOUNT**

A.    **Governing Law; Dispute Resolution; Arbitration; Statute of Limitations**

All disputes arising from or related to your Account or this Agreement shall be governed by the substantive laws of the State of Texas (without regard to its conflict of laws principles). Frost Bank is located in San Antonio, Texas, and that is where your Account was opened and is maintained. Governing Texas law may be supplemented as necessary by federal law.

**THIS AGREEMENT PROVIDES FOR THE BINDING ARBITRATION OF ALL DISPUTES THAT CANNOT BE RESOLVED BY NEGOTIATION OR MEDIATION. THIS MEANS ALL DISPUTES ARISING OUT OF, OR RELATED IN ANY WAY TO YOUR ACCOUNT OR THIS AGREEMENT, REGARDLESS OF ANY PRIOR AGREEMENT, DISCUSSION OR UNDERSTANDING, SHALL BE RESOLVED BY BINDING ARBITRATION, AND NOT THROUGH LITIGATION OF ANY KIND, IN ANY COURT, BY ANY JUDGE, BY ANY JURY OR OTHER TRIBUNAL (EXCEPT FOR MATTERS IN SMALL CLAIMS COURT, AND ACTIONS UNDER SECTION III.C. (FRAUD AND LOSS PREVENTION; LEGAL PROCESS; LEGAL COMPLIANCE; RESERVATION OF RIGHTS) OF THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, INTERPLEADER ACTIONS). THIS AGREEMENT TO ARBITRATE ANY AND ALL DISPUTES IS ENTERED INTO PURSUANT TO THE TEXAS CIVIL PRACTICE AND REMEDIES CODE, CHAPTER 171, "THE TEXAS GENERAL ARBITRATION ACT", AND AS NECESSARY, PURSUANT TO THE FEDERAL ARBITRATION ACT 9 USC, §§1-16.**

Prior to binding arbitration described in this Agreement, you and the Bank shall first attempt to resolve any dispute arising out of your Account or this Agreement through negotiation. Such negotiation may include an "in person" meeting between you and the Bank at a mutually agreed time and place, and an exchange of documents pertaining to the dispute. Such negotiation shall be conducted in good faith, and confidential customer information disclosed or discussed in the course of the negotiation shall remain confidential as provided by law. If you decline to negotiate, you will be deemed to have waived your right to negotiate or mediate and your only remedy is binding arbitration. All costs and expenses associated with the negotiation of the dispute shall be paid by the Party incurring such cost or expense.

If you and Bank are unable to resolve the dispute through negotiation, then you and Bank agree to submit the dispute to mediation. Either you or the Bank may request mediation upon written notice to the other Party. Such mediation will be scheduled to take place within thirty (30) calendar days after the notice is given. You may designate the mediator. The person you select must: (i) have ten (10) years or more of practical working experience in the commercial banking industry; (ii) be an attorney licensed by the state of Texas, in good standing with the Texas State Bar, with substantial experience in the trial or resolution of commercial disputes; or (iii) be a member in good standing of the Texas Academy of Distinguished Neutrals. The Bank shall make no objection to the mediator except for good cause shown. If you fail to designate a mediator, or fail to participate in the mediation, you will be deemed to have waived your right to mediate and your only remedy is binding arbitration.

The mediation shall occur in the county seat of the Texas county of your permanent residence, or if your permanent residence is outside of the state of Texas or the U.S., then in San Antonio, Texas. All costs, expenses, and fees with regard to any mediation, except for each Party's attorneys' fees, shall be divided equally between you and the Bank, and you and the Bank shall each be solely responsible for payment of your share of such costs, expenses and fees.

If the mediation is not successful, either you or the Bank may file a claim in arbitration. Any request for arbitration must be by written request delivered to the other Party by certified mail. The arbitration will be administered by the American Arbitration Association ("AAA") or like organization in accordance with the rules for resolution of commercial disputes and the Texas Arbitration Act.

For claims in excess of $100,000, the matter will be decided by a panel of three (3) arbitrators, one of whom shall be appointed by you and one by the Bank. The third arbitrator shall be selected by mutual agreement of the parties. If you and the Bank are unable to agree upon the appointment of the third arbitrator, your designated arbitrator and Bank's designated arbitrator shall jointly select an arbitrator who shall act as the third arbitrator on the panel of three (3). If the arbitrators cannot agree on the appointment of the third member, the AAA or like organization shall appoint the third member subject only to a disqualification for cause. Any person appointed or selected by you and the Bank to serve as an arbitrator must: 1) have ten (10) years or more practical working experience in the commercial banking industry, 2) be an attorney licensed by the state of Texas, in good standing with the Texas State Bar, with substantial experience in the trial or resolution of commercial disputes, or 3) be a member in good standing of the Texas Academy of Distinguished Neutrals. If the third arbitrator is jointly selected by your and the Bank's designees or by the AAA or like organization, that third arbitrator shall have these same industry or legal experience or credentials described above.

Arbitration shall occur in the county seat of the Texas county of your permanent residence, or if your permanent residence is outside the State of Texas or the U.S., then in San Antonio, Texas. It is anticipated that the arbitration will take place within ninety (90) calendar days after notice is given. Also, you and the Bank agree that the arbitrator(s) do not have authority to render a decision which contains reversible error of Texas or federal law, or to recognize a cause of action or remedy not expressly provided for under existing Texas or federal law. Where there is any conflict of law regarding an appeal of any decision of the arbitrators, you and the Bank agree that Texas law shall control. The arbitrators shall have no authority to award punitive damages or any other relief not measured by the prevailing Party's actual damages (e.g., two times actual damages). The arbitrators shall in no event, have any power or authority to consolidate claims asserted by different claimants or counter-claimants, adjudicate any claims presented to them on a class wide basis, treat any claimant or counter-claimant as a representative of a class of claimants or counter-claimants, or award any relief on a class-wide basis.

The arbitrator(s) shall express their decision in a written award supported by findings made by the arbitrator(s) and signed by all. Judgment may be entered upon any award in any court having jurisdiction. You and Bank agree that the fact of the arbitration, all submissions to and proceeding before the arbitrators, and the written decision and findings of the arbitrators shall remain

confidential between you and Bank unless necessary to appeal to a secure judicial review or confirmation, or as required by law.

The only exceptions to the negotiation, mediation or arbitration of disputes are that: (i) you have the right to pursue a claim in a small claims court instead of arbitration if the claim is within that court's jurisdiction and proceeds on an individual basis; and (ii) we have the right to take any action described in Section III.C. (Fraud and Loss Prevention; Legal Process; Legal Compliance; Reservation of Rights) of this Agreement, including, but not limited to, an interpleader action.

This agreement to arbitrate will apply without limitation, regardless of whether: (i) your Account is closed; (ii) you pay us in full any outstanding debt you owe; or (iii) you file for bankruptcy.

The agreement to arbitrate applies whenever there is a dispute between you and Frost Bank and if a third party is also involved in the dispute, then the dispute will be decided with respect to the third party in arbitration as well. The third party must be named as a party in accordance with the rules of procedure governing the arbitration. No award or relief will be granted by the arbitrator except on behalf of, or against, a named party.  For purposes of arbitration, "you" includes any person who is listed on your Account, and "Bank" includes Frost Bank, all its affiliates, and all third parties who are regarded as agents or representatives of ours. The arbitration may not be consolidated with any other arbitration proceeding.

As is referenced above, the AAA or like organization will be the arbitration administrator. That organization will apply its procedures in effect at the time the arbitration claim is filed. This Agreement will control any conflicts between its procedures and this Agreement. In the event that the AAA or like organization is unable to administer the dispute for any reason, then any dispute less than $100,000 shall be arbitrated instead by a neutral arbitrator selected by agreement of the parties from the current membership roster of the "Texas Academy of Distinguished Neutrals" or, if the parties cannot agree, selected by the Academy's current Texas President from the current membership, Texas roster. Disputes in excess of $100,000 where the AAA or like organization cannot serve shall be decided by a panel of three (3) arbitrators selected in the manner and credentialed in the way described above. If the parties and the arbitrators cannot agree on the third arbitrator, the third arbitrator shall be designated by the President of the Texas Academy from the current roster of "Distinguished Neutrals" resident in Texas.

The arbitrator(s) will decide the dispute in accordance with applicable Texas law, including recognized principles of equity and statutes of limitations, conditions precedent to suit, and will honor all claims of privilege recognized by law. The arbitrator(s) will have the power to award to a Party any damages or other relief provided for under applicable law.

For disputes less than $100,000, a single arbitrator will conduct the arbitration and will use substantive Texas law, and the applicable statutes of limitations or conditions precedent to suit, and will honor claims of privilege recognized at law. The arbitrator can award damages or other relief provided for by law to you or Frost, but not to anyone else. The arbitrator's authority is limited to the dispute between you and Frost. Disputes in excess of $100,000 are subject to this same limitation.

The arbitrator(s)' decision, rendered in a reasoned opinion, will be final and binding on the parties. A party can file a written appeal to the arbitration administrator or request a new arbitration within thirty (30) days of issuance of the award. The appeal must request a new arbitration based on good faith objection to the reasoned opinion of the arbitrator(s) and shall be heard by three (3) neutral arbitrators designated by the AAA or like organization. The panel will reconsider all factual and legal issues following the same rules of procedure and, based on majority vote, determine whether any reversible error has occurred. Any final arbitration award, rendered in a reasoned opinion, will be binding on the named parties and enforceable by any court having jurisdiction.

Frost will pay any costs that are required to be paid by Frost under the arbitration administrator's rules of procedure. Even if not otherwise required, Frost will reimburse you up to $500 for any initial arbitration filing fees you have paid. We will also pay any fees of the arbitrator and arbitration administrator for the first day of any hearing. If you win the arbitration, we will reimburse you for any fees you paid to the arbitration administrator and/or arbitrator. All other fees will be allocated according to the arbitration administrator's rules and applicable law. If you believe that you are unable to afford any fees that would be yours to pay, you may request that we pay or reimburse them, and we will consider your request in good faith on a case-by-case basis.

Rules and forms may be obtained from, and claims may be filed with the AAA or like organization at their respective offices on their web pages. Arbitration hearings will take place in the county seat of the Texas county of your permanent residence at the time the claim is filed. If your permanent residence is outside the State of Texas or the U.S., the arbitration proceeding shall be conducted in San Antonio, Texas.

It is possible that third parties involved in the negotiation, mediation, and arbitration protocol, such as lawyers, accountants, or contractors, who offer products or services to the public may be Frost customers. We provide this information only as a courtesy and convenience to you. We do not make any warranties or representations about the third parties or their products or services. We are not responsible for the third party's performance or to help resolve any dispute between you and the third party.

**This provision limits your rights to a jury trial. You should review this provision carefully.** If: (i) neither you nor we seek to compel arbitration of any dispute we have related to this Agreement, your Account, or any transactions involving your Account; or (ii) some or all of these arbitration provisions are unenforceable and we are in a dispute in a court of law, then each of us agrees to waive any right we may have to a jury trial to the extent allowable under Texas law.

**You agree that, unless a different period is set forth herein, any claim, action, suit or proceeding against Frost for**

damages resulting in any respect from its acts or omissions in its performance under this Agreement must be brought within two (2) years from the date of Frost's alleged act or omission.

### B.   Systems and Software

We shall not be responsible to you for any loss or damages suffered by you as a result of the failure of systems and software used by you to interface with our systems and software utilized by you to initiate or process banking transactions, whether such transactions are initiated or processed directly with our systems or through a third-party service provider. You acknowledge that you are solely responsible for the adequacy of systems and software utilized by you to process banking transactions and the ability of such systems and software to do so accurately.

### C.   Fraud and Loss Prevention; Legal Process; Legal Compliance; Reservation of Rights

Frost Bank reserves the right to inquire about any deposits made, withdrawals from, or other disposition of funds or Account transactions or activity, regarding any or all of your Frost Bank Accounts, including, but not limited to, the right to contact you directly regarding any Account activities. You agree not to use your Account in any illegal activity, including, but not limited to, "restricted transactions" as defined under the Unlawful Internet Gambling Enforcement Act. In order to help us prevent fraud or other loss regarding your Account, you agree to exercise ordinary care to safeguard all Account checks, Debit Cards, PINs, User IDs, Account statements, and any other document or instrument that contains or may contain your sensitive financial information. In addition, if you own a Business Account, you acknowledge and agree to your duty to exercise ordinary care in safeguarding such materials with regard to your employees in accordance with the requirements of Texas Business and Commerce Code Sections 3.405, 3.406 and 4A.202.

If you or your Account becomes involved in a Legal Process, your use of the Account may be restricted. We shall be entitled to act upon any Legal Process served upon us which we reasonably believe to be binding, with no liability to you for doing so. We may charge your Account a fee for each Legal Process. You agree to pay us for fees and expenses (including administrative expenses) that we incur in responding to any Legal Process related to your Account, such as expenses for research and copying of documents. The fees and expenses may include attorneys' fees. We may deduct these fees and expenses from any of your Accounts without prior notice to you as further described in Section VI.M. (Right of Setoff).

If you ask us to follow instructions that we believe might expose us to any claim, liability, or damages, we may refuse to follow your instructions or may require a bond or other protection, including your agreement to indemnify us. In addition, if we are presented with or have reasonable grounds to anticipate conflicting instructions regarding your Account, or if we have any reason to believe there is a dispute regarding your Account, such as conflicting instructions concerning funds in your Account or signatory authority to the Account, we may take any action described above or we may, unilaterally and in our sole judgment, place funds in a court (an "interpleader action") for resolution. If any person notifies us of a dispute, we do not have to decide if the dispute has merit before we take further action. You agree to be liable to us for any loss, costs, or expenses, including, without limitation, reasonable attorneys' fees, that we may incur as a result of any conflicting instructions, dispute or legal proceeding involving your Account. You authorize us to deduct any such loss, costs, or expenses from your Account without prior notice to you or to bill you separately, in our sole discretion. This obligation includes disputes between you and us involving your Account and situations where we become involved in disputes between you and an authorized signer, a joint owner, or a third party claiming an interest in your Account. It also includes situations where any action taken on your Account by you, an authorized signer, a joint owner, or a third party causes us to seek the advice of an attorney, whether or not we actually become involved in a dispute. Any action by us for reimbursement from you for any costs or expenses may also be made against your estate, heirs and legal representatives, who shall be liable for any claims made against and expenses incurred by us.

If a court finds any provision of the Agreement to be invalid or unenforceable, such finding shall not make the rest of the Agreement invalid or unenforceable. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of the Agreement in all other respects shall remain valid and enforceable.

When you open an Account with us, you give us information about yourself, confirm that it is correct, and understand that you have an ongoing obligation to provide us with updated and correct information so long as you maintain your Account with us. We enter the information into our records. We may rely on that information until you notify us of a change and we have had a reasonable time to act on the new information. All financial institutions are required by law (including, but not limited to, the USA PATRIOT Act) to obtain, verify and record information that identifies each customer who opens an Account with that financial institution (including, but not limited to, beneficial owners of an entity that opens a Business Account).

In order to serve you better, and for quality assurance and other purposes, we reserve the right, but are not obligated to, record any customer service or other telephone calls between you and the Bank, and you consent to any recording. You also understand that supervisory personnel may randomly monitor customer service telephone conversations to ensure that you receive accurate, courteous and fair treatment. If you are a Business Account customer, you expressly grant permission for Bank to monitor and record calls made by any of your employees regarding your Account(s).

As part of our legal compliance and loss prevention program, if at any time we suspect that your Account may be subject to

irregular, unauthorized, fraudulent or illegal or unlawful activities, or when we are presented with or have reasonable grounds to anticipate conflicting instructions regarding your Account or a dispute regarding your Account, we may, in our discretion, place a Hold on some or all of the funds in your Account and in other Accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of such suspected activities, conflicting instructions or dispute, or interpleader action with regard to the Account and transactions.  In addition, we may also place a Hold on some or all of the funds in your Account, or on particular transactions on your Account, without any liability to you, in accordance with our obligations under Texas Finance Code Chapter 280 ("Protection of Vulnerable Adults from Financial Exploitation") to investigate and report suspected incidents of financial exploitation against "vulnerable adults" as defined under that law, which includes adults who are sixty-five (65) years or older or a person with a disability. We may also block certain transactions that we suspect are illegal, including, but not limited to, transactions in violation of the Unlawful Internet Gambling Enforcement Act.  If we do place a Hold on your Account, we may give notice as required by the laws governing your Account.  Notice may be made by mail or verbally or provided by other means such as via Online Banking or text alerts as permitted by law or updated balance information.  We may not provide this notice to you prior to placing a Hold on your Account(s) if we believe that such notice could result in a security risk to us or to the owner of the funds in the Account.  You may contact the Frost Bank Customer Service Call Center at 1-800-513-7678 with questions about your Account(s).

If we suspect that your Account has been subject to irregular, unauthorized, fraudulent, illegal or unlawful activities, and we notify you regarding such activity, it is strongly advised that you close the affected Account and open a new Account. In addition, we provide various fraud monitoring products and services that assist in preventing fraudulent activity that we strongly recommend you implement regardless of any suspected irregular or fraudulent activity, and we may also require that you implement specific fraud monitoring products or services in the event that your Account has been compromised due to unauthorized, fraudulent, illegal or unlawful activities. If your account has been compromised, should you decide against closing an Account as required by us, or if you decide not to implement products or services that are designed to deter fraudulent activity after we have required you to implement such products or services, you will be precluded from asserting any claims against us for any fraudulent activity.

You represent that you are not engaged in the production, manufacturing/refinement, distribution or sale of cannabis or cannabis-derived products that are classified as Schedule I drugs under the federal Controlled Substances Act either directly or indirectly. You further represent that you do not derive any of your income from entities that are engaged in the production, manufacturing/refinement, distribution or sale of cannabis or cannabis-derived products that are classified as Schedule I drugs under the federal Controlled Substances Act, either directly or indirectly (including, but not limited to, rental property income).  If you are engaged in any of the activities described above, you must disclose such fact prior to opening your Account with us, and we reserve the right to deny you an Account based on such activity.  You also understand and agree that we may terminate your Account immediately if you become engaged in any of the activities described in this paragraph during the course of your relationship with us.

You represent that you are not engaged in the production, manufacturing/refinement, distribution or sale of industrial hemp or industrial hemp-derived products (such as products containing CBD oil) that are not classified as Schedule I drugs under the federal Controlled Substances Act.  You further represent that you do not derive any of your income from entities that are engaged in the production, manufacturing/refinement, distribution or sale of industrial hemp or industrial hemp-derived products (such as products containing CBD oil) that are not classified as Schedule I drugs under the federal Controlled Substances Act, either directly or indirectly (including, but not limited to, rental property income).  If you are engaged in any of the activities described above, you must disclose such fact prior to opening your Account with us, we reserve the right to request proof of current certifications or licensing for such activities, and we reserve the right to deny you an Account based on such activity.  You also understand and agree that we may terminate your Account immediately if you become engaged in any of the activities described in this paragraph during the course of your relationship with us.

We cannot facilitate any transactions involving any individuals or entities that are listed on the United States Department of Treasury's Office of Foreign Assets Control's "Specially Designated Nationals and Blocked Persons List."

The federal Bank Secrecy Act ("Act") also requires all financial institutions to report cash transactions of more than $10,000 to the Internal Revenue Service (IRS). In addition, we may report to the IRS multiple cash transactions which together total more than $10,000 in any one
(1) day.

We are required by law to maintain a log of all sales of bank checks or drafts, cashier's checks, money orders, and certain other products purchased in cash.

We are obligated by federal law to report to applicable government agencies transactions that may be structured with the intent to avoid the reporting requirements, and other transactions that appear to involve illegal activity. It is important that you understand that breaking transactions into amounts under any reporting amounts, commonly referred to as structuring, is a violation of federal law.

In order to satisfy the Act's requirements, we may, and in many cases, must request certain information about the individual presenting the transaction, as well as the organization or individual for whom the transaction is being conducted. This includes the individual's/organization's full name, permanent street address, Social Security Number, Taxpayer Identification Number,

other identification numbers (such as driver's license, ID or passport), date of birth (if applicable), and business, occupation or profession.

You acknowledge that the terms of the Texas Uniform Commercial Code Section 4.209 pertain to all encoded items. If you encode information on or with respect to an item after issue, you warrant to us, any subsequent collecting bank, and to the payor bank that the information is correctly encoded. After we have made a good faith effort to collect any discrepancies, you agree we may debit your Account for any losses charged to us resulting from encoding errors created by you.

We reserve the right to convert or change your Account type at any time when we consider it appropriate or necessary to do so. For example, we may close, revoke privileges or convert your Account to another type of Account if we think another type of Account would better suit the way you use your Account, if you make frequent transactions on a money market deposit or savings Account, if your Account frequently has debits against uncollected funds, if your Account has excessive deposit activity or if you use a Personal Account for anything other than personal, family or household purposes. If we convert your Account, we will send you information about your new Account.

**D.   Account Termination**

Either you or we may close your Account (other than a CD) at any time for any reason or no reason without prior notice, except that we may require you to give us seven (7) days advance notice when you intend to close your savings or interest bearing checking Account by withdrawing funds. (Federal regulations require us to retain the right to require all savings and all NOW Account Holders to give seven (7) days' written notice before making a withdrawal.) If we decide to close your Account, we may, in our sole discretion, mail you notice of Account closure, and such notice will be mailed to your statement mailing address or sent to you via Online Statement Delivery (if you are enrolled in Online Statement Delivery).

We are not required to close your Account at your request if you have pending transactions, the Account is overdrawn or your account is subject to Legal Process (such as garnishment, attachment, execution, levy or similar order).  In those cases, we will restrict your Account against all future withdrawals other than under Legal Process until pending transactions are paid or returned, the balance is no longer negative, and any legal restriction has been released. We may automatically close your Account if the balance is $0 or negative.  Either you or we may close your CD Account on any maturity date without cause, and we may close your CD Account prior to any maturity date if such CD Account is pledged as loan collateral or as otherwise necessary to satisfy any debt owed to us.

After your Account is closed, we have no obligation to accept deposits or pay any outstanding checks, but we may reopen your Account if we receive a deposit, or we may apply an incoming deposit to satisfy any outstanding items or obligations owed to us. We have the right to advise consumer reporting agencies and other third party reporting agencies of Accounts closed for misuse, such as overdrafts.

For security reasons, we may require you to close your Account and to open a new Account if: (1) there is a change in authorized signers; (2) there has been a forgery or fraud reported or committed involving your Account; (3) any Account checks are lost or stolen; (4) you have too many transfers from your Account; or (5) any other provision of our Agreement with you is violated. After the Account is closed, we have no obligation to accept deposits or pay any outstanding checks on that Account.

You agree to hold us harmless for: (1) refusing to honor any check or other item presented to us for payment on a closed Account; (2) refusing to collect any check you have deposited in your Account, to collect any check you have deposited to your closed Account, or to accept any automated deposit or electronic funds transfer to your closed Account; (3) assessing any service charge otherwise applicable against any remaining balance in your Account; and (4) retaining all funds in the Account until we are reasonably satisfied that the time for items to be returned to us has lapsed and that all remaining funds are fully collected. If your Account is overdrawn when closed, you agree to pay immediately all amounts you owe to us.

If your Account had funds in it when closed, we may: (1) hold the funds for your pick up or to pay outstanding or expected items or claims; (2) deposit the funds in another of your Accounts with us; or (3) mail the funds in the form of a cashier's check to any of you by check at the address in our records for the Account. The termination of this Agreement and closing of an Account will not release you from any fees or other obligations incurred prior to the date upon which this Agreement is terminated and the Account closed, any fees assessed by us in the process of closing an Account, or from your responsibility to maintain sufficient funds in your Accounts to cover any outstanding checks or other debit items. We will not be liable to you for any damages you may suffer as a result of your Account being closed or the process that follows the decision to close your Account.

**E.   Assignability**

You may not grant a security interest in, transfer, or assign your Account to anyone other than us without our written consent. No assignment will be valid or binding on us, and we will not be considered to have "knowledge" of it, until we consent and the assignment is noted in our records. However, by noting the assignment, we do not have any responsibility to assure that the assignment is valid. Any permitted assignment of your Account is subject to and superseded by our setoff rights and remains subject to any other right we have under the Agreement and applicable state and federal law. If you want to transfer ownership, we may require that you close the Account and open a new Account in the name of the transferee or pledgee.

### F.  Frost Bank Property, Branch and ATM Code of Conduct

Frost Bank takes measures to ensure that Frost Bank properties, branch locations and ATM locations that are owned and controlled by Frost Bank (the "Premises") are safe and secure.  However, Frost Bank customers also have a responsibility to themselves and to others (including Frost Bank employees) to ensure that everyone who is present on the Premises conducts themselves in a respectful, safe and secure manner to promote a safe and pleasant in-person banking experience.  Therefore, all Frost Bank customers must abide by the Frost Bank Premises code of conduct stated here.

Any Frost Bank customer or visitor violating the Premises code of conduct may be asked to immediately cease the conduct in violation of the Frost Bank code of conduct or leave the Premises.  In addition, repeated or serious violations of the Frost Bank code of conduct by a Frost Bank customer may result in action against such customer, including, but not limited to, Frost Bank exercising its rights under Section III.D. (Account Termination) of this Agreement to close such Frost Bank customer's Account(s).

• Frost Bank will not tolerate violence or threats of violence or physical harm in any of its Premises.  Any physical or verbal behavior that endangers or harms Frost Bank employees, other Frost Bank customers, or other visitors to the Premises constitutes a threat and Frost Bank may, in its discretion, remove the offending Frost Bank customer from the Premises, or may take other actions within Frost Bank's rights, including prosecution.

• Disruptive conduct of any nature by a Frost Bank customer will not be tolerated on the Premises, and such conduct will result in ejection of the disruptive Frost Bank customer from such Premises.  Frost Bank may also exercise its right to deny entry to the Premises to any Frost Bank customer or other person what is identified as being disruptive or a threat to Frost Bank employees, Frost Bank customers, or others.

• No Frost Bank customer will interfere with the safe operation of any Premises, and will comply with the instructions of Frost Bank employees, including security personnel.

• Frost Bank customers must respect Frost Bank employees, other Frost Bank customers, and others in the Premises. Fighting, vulgar language, harassing others, shouting, spitting, throwing an object, or pushing others is prohibited at all times.

• Possession or consumption of alcohol or illegal drugs is prohibited on the Premises, and smoking, including e-cigarettes and vaporizers, are only allowed on the Premises in specially designated areas.

• Flammable liquids, fireworks, or other corrosive items are not allowed on the Premises, and hover boards or electronic scooters are not allowed in the interior of any Premises.

• Congregating or loitering near the entries, exits or ATM machines of the Premises in a way that causes an inconvenience to others or blocks entry, exit or access is prohibited.

• Soliciting money or distributing literature on the Premises is not allowed at any time.

### IV.
### INFORMATION ABOUT YOU AND YOUR ACCOUNT

### A.  Credit Verification and Reporting

You authorize us to request and obtain one (1) or more credit reports about you from one (1) or more credit reporting agencies for the purpose of considering your application for the Account, reviewing or collecting any Account opened for you, or for any other legitimate business purpose. You authorize us to disclose information about your Account to a credit reporting agency if your Account was closed because you have abused it. In addition, federal statute permits us to report information about your Account to credit bureaus, and you hereby consent for us to do so. Late payments, missed payments or other defaults on your Account may be reflected in your credit report.

### B.  Notify Us of Inaccurate Information We Report to Consumer Reporting Agencies

Please notify us if we report any inaccurate information about your Account(s) to a consumer reporting agency. You should send your written notice describing the specific inaccuracy(ies) to Frost Bank, P.O. Box 1600, San Antonio, Texas, 78296, Attention: Loan Operations.

### C.  Consent to Autodialed and Prerecorded Phone Calls and Text Messages; Consent to Fraud Alert Text Messages and Email Communications; Consent to Geo-Location Based Fraud Prevention

By entering into this Agreement, you agree that you are providing your express consent for Frost and any Frost third-party

service provider to call you, text message you, or both at any phone number (including any mobile phone number) you provide to Frost or any Frost third-party service provider using auto-dialed phone calls, prerecorded phone calls, or both for any or all of the following reasons: (i) transactional purposes; (ii) informational purposes; (iii) to provide account alerts; (iv) to provide servicing information; (v) fraud prevention purposes; and (vi) any other purposes provided for in this Agreement or in any other applicable Frost agreements, including, but not limited to, Frost's Customer Privacy Statement. If you change any phone number you have provided to Frost or any Frost third-party service provider, for any reason, you agree to immediately notify Frost to ensure that the above communications are not interrupted or inadvertently delivered to another recipient who may be reassigned your prior phone number. You may change your phone number by following the steps outlined at www.frostbank.com.

Frost Bank is committed to providing you robust fraud protection services and tools. As part of that commitment, and in addition to optional account activity alerts that Frost provides to you, we also may provide text and email-based fraud alerts to all Frost customers. This allows us to contact you when we identify a potentially fraudulent Debit Card transaction. After receiving such an alert, you can either verify the transaction or let us know it is fraudulent. By entering into this Agreement and providing Frost with your valid mobile number (whether or not you have indicated to Frost it is a mobile number) and valid email address that Frost keeps on record for you, you understand and agree that Frost or Frost's third-party service provider will send such fraud alert messages to both your current mobile phone number (via text message) and current email address as part of such fraud prevention service.

In addition, Frost also utilizes certain geo-location fraud prevention services. By entering into this Agreement, you understand and agree that Frost may use your unique mobile device ID, IP address for your laptop or desktop computer, your device's location services, and any security tokens or cookies that Frost may place on such mobile or other devices, in order to monitor transaction location and activity for fraud prevention purposes.

**V.**

**OUR COMMITMENT TO SECURITY**

Frost Bank recognizes and respects our customers' right to privacy and security concerning their financial information. We are committed to maintaining the confidentiality and security of our customers' financial information, which is consistent with Frost Bank's values and commitment to customer service. As part of our banking services, we employ various authentication technologies for your protection.

**A.   Debit Card Services (Including Health Savings Account Debit Cards)**

As part of our Debit Card Services (as defined in the Frost Personal and Health Savings Account Debit Card Agreement and Disclosure and the Business Debit Card Agreement and Disclosure), Frost utilizes a unique Personal Identification Number ("PIN") associated with each card. Our Personal and Health Savings Account Debit Card Agreement and Disclosure (or similar agreement) for Personal Accounts, and our Business Debit Card Agreement and Disclosure (or similar agreement) for Business Accounts contains a description of the Frost Bank recommended customer practices for maintaining the security of your Debit Card number and associated PIN. We strongly encourage you to review the Security Procedures, requirements and recommended practices.

**B.   Frost Online Banking Services for Personal and Business Accounts**

As part of the Frost Online Banking Services as defined in the Frost Online Banking Agreement and Disclosure for Personal Accounts, and the Business Debit Card Agreement and Disclosure (or other similar agreement) for Business Accounts, you may use your computer or mobile device to obtain Account information, make certain funds transfers, and to arrange for payment of bills. These Frost Bank agreements and disclosures contain a description of Frost Bank's Security Procedures for online banking activities. You should know that Frost Bank employs various security and authentication technologies to ensure that you (an authorized customer) are communicating directly with Frost Bank. Frost Bank also employs various security and authentication measures to ensure to you that the device you are connected to for Online or Mobile Banking Services is recognized by Frost. Such Frost Bank authentication procedures include, but are not limited to, use of customer online banking User IDs, passwords and other additional authentication information that Frost Bank may require you to provide, in its sole discretion. "Additional Authentication Information," or "AAI" is information used in conjunction with various online and mobile banking authentication procedures that we may employ, including, but not limited to, security questions and responses and/or use of other hardware-based and software-based security and authentication tools, programs and procedures. We strongly encourage you to review the Security Procedures, requirements and recommended practices in your applicable agreement and disclosure and any supporting documentation regarding Frost Bank Online Banking Services, which includes Mobile Banking Services and Bank's remote deposit capture services, "Digital Deposits."

**C.   Mobile Device and Wireless Internet Access**

To help safeguard against potential unauthorized use of your Account, you should employ reasonable caution when using a mobile phone, mobile device, tablet, wearable device, or wireless Internet access to conduct any electronic transactions with us

(including, but not limited to, SMS text message transactions). If your use of a mobile phone, mobile device, tablet, wearable device, or wireless Internet access is not encrypted, then any confidential Account information contained in such wireless or mobile communications can be intercepted without your knowledge or authorization. In addition, if you use wireless Internet access via laptop, personal computer, mobile phone, mobile device, tablet, or wearable device to conduct any online (including mobile) banking activities provided by Frost Bank, please be advised that we strongly encourage you to conduct wireless Internet transactions only over a secured wireless network facility. Although Frost Bank employs security and authentication procedures for customers using our Online Banking Services (including optional Mobile Banking Services), we strongly encourage you to conduct wireless Internet online banking activities only over a secure wireless network to further ensure that your Account information, password, User ID and any AAI cannot be intercepted during transmission over a wireless network without your knowledge or authorization.

## VI.
## DEPOSIT ACCOUNTS

From time to time, we may offer or you may open various types of deposit Accounts. Each Account you open is subject to these general terms and conditions and any specific terms and conditions relating to that type of Account that may be set forth in any applicable agreement or any Schedule. If you open multiple Accounts, you may receive Schedule information and certain disclosures for each Account, but this Agreement will cover all your Accounts with us. If there is more than one Account owner, then each of you will be jointly and severally liable to us for debit balances in the Account, including, without limitation, overdrafts and Account charges, and you each jointly and severally promise to pay, upon demand, any and all debit balances, all fees and charges, and our reasonable attorneys' fees and costs and expenses of collection, including, but not limited to, those incurred at trial and on any appeal.

### A.   Interest

If your Account earns interest, the following information applies:

(1)   **Payment of Interest –** We will pay interest at the annual rate specified on the applicable Schedule, which does not reflect compounding. The Schedule also shows how often we will pay you interest, if that interest is compounded, how we will calculate the interest we will pay, the balance on which we will pay interest, and any minimum balance requirements. Compounding generally means that interest is being accrued on interest previously earned but not yet paid. Interest may be compounded more frequently than interest is credited to your Account. Interest that has been calculated, but not paid to the Account, is called "accrued unpaid interest."

(2)   **Minimum Balance Requirements –** The Schedule may specify a minimum balance that you are required to maintain in your Account. If the minimum balance is not maintained as shown on the Schedule, we, at our option, may not pay interest on your Account and/or may charge a fee for that period. You should review any minimum balance requirements on any applicable Schedule(s).

(3)   **Initial Interest Rate –** The "Initial Interest Rate" is the current annual rate of interest that we will pay on the specified balance in your Account. We may pay interest at different rates, depending on the amount deposited and the type of depositor (individual, business, non-profit organization, etc.).

(4)   **Changes –** We have the right to change the rates and fees in accordance with the Schedule. We also reserve the right to change any other term of this Agreement at our sole discretion, but we will make reasonable attempts to notify you of such changes.

### B.   Fees and Charges

Except as limited by law, you agree to pay us the fees and charges shown in the Schedules applicable to your Accounts and for other services we perform. You agree that we may change the fees and charges from time to time and you authorize us to charge your Account for their payment even if the charge results in an overdraft of your Account. We may set the rate of both existing and future fees and charges upon the overall costs of providing Account services, and they need not be based upon the direct cost of providing the particular service involved. We may establish the rate and amount of fees and charges based on profit, competitive position, deterrence of misuse of Account privileges by customers, and the safety and soundness of the Bank. We will notify you of any changes as required by law.

### C.   Funds Availability Policy Disclosure

(1)   **Your Ability to Withdraw Funds –** The provisions in this Section VI.C. (Funds Availability Policy Disclosure) apply only to demand deposit checking Accounts. Our policy is to generally make funds from your check deposits available to you on the first Business Day after the day we receive your deposit. Funds from cash and electronic direct deposits will generally be available on the day we receive the deposit. Once funds are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written. For determining the availability of your deposits, every day is a Business Day, except

Saturdays, Sundays, and federal holidays. If you make a deposit on a day that is not a Business Day, we will consider the deposit made on the next Business Day we are open.

(2)     **Longer Delays May Apply –** In some cases, we will not make all of the funds that you deposit by check available to you on the first Business Day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second Business Day after the day of your deposit. **The first $225 of your deposits, however, will be available on the first Business Day after the day of your deposit.** If we are not going to make all of the funds from your deposit available on the first Business Day after the day of your deposit, we will notify you at the time you make your deposit. We will also provide you with an estimate of when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the Business Day after we receive your deposit. If you will need the funds from a deposit right away, you should ask us when the funds will be available. While we may provide you with an estimate of when the funds will be available, please be advised that the funds are still subject to final settlement.

**In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:**

- We believe a check you deposit will not be paid.

- **You deposit checks totaling more than $5,525 on any one day.**

- You redeposit a check that has been returned unpaid.

- You have overdrawn your Account repeatedly in the last six months.

- There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will provide you with an estimate of when the funds will be available. They will generally be available no later than the seventh Business Day after the day of your deposit.

(3)     **Holds on Other Funds (Check Cashing) –** If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available to you if you had deposited the check.

(4)     **Holds on Other Funds (Other Accounts) –** If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another Account with us. The funds in the other Account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

## D.   Deposit Rules

The following terms apply to deposits made to your Account(s):

(1)     **Endorsements –** You authorize us to accept transfers, checks and other items for deposit to your Account if they are made payable to, or to the order of, any one (1) or more of you, whether or not they are endorsed by you; however, we may, at our option, require your personal endorsement prior to accepting an item for deposit. With the exception of checks and other items where the payor has required two or more endorsements, you authorize us to supply missing endorsements. We may refuse items for deposit when an endorsement is missing if the payor has required two or more endorsements. We may accept for deposit checks payable to any signer on your Account when endorsed by any other signer. For all checks and other items deposited into your Account, you warrant that all endorsements are genuine. All checks and other items physically deposited to your Account should be endorsed payable to the order of "Frost Bank for deposit only," followed by your signature and Account number.  All Substitute Checks deposited via Frost Digital Deposits (as further described in Section VII (Digital Deposits)) must be endorsed payable to the order of "Mobile Deposit Only, Frost Bank," followed by your signature and Account number. All endorsements must appear on the back of the check or other item within the first 1-1/2 inches from the left side of the item when looking at it from the front, except that for Substitute Checks, endorsements that appeared on the back of the Original Check must also appear on the back of the Substitute Check.  If you endorse a check outside of these areas, mark or otherwise obscure the other areas or a prior endorsement or make an endorsement that is illegible or incomplete, we may refuse the item or we may accept such nonconforming endorsement and you agree to hold us harmless from any loss, delay, liability, claim or damage which may arise as a result.

While we may accept non-conforming endorsements, you will be responsible for any loss incurred by us due to the delay in processing or returning the item for payment. We may (but are not required to) refuse to accept a check or other item for deposit to your Account if: 1) the check or other item is made payable to someone other than you or a joint Account Holder with you; and 2) the check or other item is not endorsed to you or a joint Account Holder with you.  We will not be liable to you for refusing such a deposit. If you deposit items which bear the endorsement of more than one person or of persons who are not signers on the Account, we may refuse the item or may require you to have their endorsement guaranteed before we accept an item. We

will not be liable to you for refusing such a deposit.

(2)   **Final Payment –** All non-cash items (for example, checks) deposited to your Account are posted provisionally, subject to verification and our receipt of final payment by the payor bank upon which the check is drawn. Upon receipt of final payment, the item becomes a collected item. If final payment is not received or if any item you have deposited or cashed is charged back to us for any reason, you authorize us to charge any of your Accounts, without prior notice and at any time, for the amount of the returned item, our returned item fee, any interest paid on that item, and any other fee we pay or incur, including, if applicable, foreign exchange fees or charges resulting from checks or drafts drawn on foreign banks. If an item to be charged back is lost in the process of collection or unavailable for return, we may rely upon a photocopy of the item or upon any other generally accepted notification of return of the item, in charging you or any of your Accounts for the amount of the returned item. We reserve the right to refuse any item for deposit into your Account.

If funds from a deposit become "available" and you withdraw funds, that does not mean the check or other item you have deposited is "good," has "cleared," or has been paid by the paying bank. It is possible that the item will be returned unpaid months or longer after we have made the funds available to you and you have withdrawn them. **No one, including our employees, can guarantee you that a check or other item (particularly one drawn on another financial institution) has been paid or will not be returned.**

(3)   **Certain Direct Deposits –** If we offer direct deposit services for automatic preauthorized deposits to your Account of Social Security payments or automatic transfers from your other Accounts with us, you must notify us at least thirty (30) calendar days prior to the next scheduled direct deposit or preauthorized transfer if you wish to cancel the direct deposit or transfer service. If any amount deposited must be returned to the government for any reason, you authorize us to deduct the amount from your Account as provided in the "Final Payment" paragraph above.

(4)   **Remotely Created Checks –** Unless Frost and you otherwise agree in writing, you agree you will not deposit, and we may refuse to accept for deposit, checks or other items that are Remotely Created Checks (as defined in the Federal Reserve Board's Regulation CC). If Frost has approved you to deposit Remotely Created Checks, and you deposit a Remotely Created Check into your Account, you warrant and guarantee that the Remotely Created Check is authorized according to the terms on its face by the person identified as drawer. You agree to indemnify us from all loss, expense and liability related to a claim that such draft or check was not authorized by the persons on whose account it was drawn.

(5)   **Foreign Items –** A "foreign item" is a check or other item in any currency (including U.S. dollars) that is drawn on a bank or branch of a bank located outside of the U.S. You should be cautious about accepting foreign items because foreign items are not subject to U.S. laws or regulations. A foreign item may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the U.S. If a foreign item is returned to us unpaid or there is some other problem with the foreign item, you are responsible for the item and you may incur a loss. Even though the foreign item is returned unpaid, we may charge you for our collection fees and for fees and charges assessed by the paying bank and any agents involved in the collection or settlement process.

(6)   **Our Right to Refuse Deposits –** We may refuse a deposit, or part of a deposit, to your Account at any time. We may also refuse a deposit after initially accepting it. If we refuse a deposit, we may take the check on a "collection basis," which means we won't add funds to your Account until we have actually been paid for the check. We will not be liable to you for refusing a deposit, even if it causes outstanding items to be returned. We can reverse any amount we have added to your Account for a deposited check and send the check on a collection basis even after we have taken physical possession of the check.

(7)   **Adjustments and Receipts –** We may rely on the Account number of any deposit slip or similar record we receive, even if that Account number is associated with a name that is different from the name you have provided. It is not Frost's responsibility to detect any inconsistency between the Account number you provide and the name. If you make a deposit, we may provide a receipt. However, the amount on your deposit receipt is based only on the deposit slip you complete. We may confirm the funds you deposit and, after review, may adjust your Account for any errors – including any errors on your deposit slip. We are not required to adjust your Account for discrepancies under $10.

(8)   **Our Responsibility for Collecting Deposits –** If you deposit or cash a check, or we send one for collection, we act only as your agent. Our only responsibility is to exercise reasonable care. We will not be liable for the lack of care of any bank we use to collect checks, or for checks lost while being shipped. We may send checks to any bank or directly to any non-bank drawee in our customary manner. We may agree with other banks regarding times and methods for collecting or returning items. If we lose a check, you agree to use reasonable efforts to help us locate or replace the lost check.

## E.   Withdrawal Rules

The following terms apply to withdrawals from your Account(s):

(1)   **Manner of Withdrawal –** You may make withdrawals from your Account in any manner that is permitted by us for the type of Account you have. Withdrawals by mail will be posted to your Account as of the day the transaction is processed by us. We may refuse to accept any check that will: (i) standard checks provided by us or approved by us in advance; or (ii) Substitute Checks conforming to Check 21 Regulations standards that were created from images of original standard checks provided by

us. Your Account may be debited at the time and on the day a check or other item drawn on your Account is presented to us for payment, by electronic or other means, or at an earlier time based on notification received by us that the check or other item has been deposited for collection in another financial institution. Withdrawals and transfers from your Account may be restricted as provided in any applicable Agreement or Schedule, or applicable law.

(2)   **Withdrawal Restrictions and Overdrafts –** We are not obligated to allow you to make a withdrawal from your Account if you don't have sufficient available funds in the Account to cover the full amount of the withdrawal. If there are available funds to cover some, but not all, of the withdrawals or other debits (such as charges) to your Account, we post those withdrawals in the manner described in this section. **The manner in which we process withdrawals or other debits may affect the amount of overdraft or non-sufficient funds charges or penalties you may incur.** We establish different categories of withdrawals or other debits to your Account for this purpose. For example, we process ATM and Debit Card transactions, teller withdrawals and loan payments payable to us before checks. Within each category, we currently process withdrawals for that category in the following manner:

•   For ATM and Debit Card transactions, provided that such ATM or point-of- sale terminal or network is properly operating, we process such transactions as they are received by us.

•   For ATM and Debit Card re-presented transactions, and for all other items for which authorization has already occurred, we process such transactions from the lowest dollar amount to the highest dollar amount.

•   For contractual obligations, such as loans payable to us, we process such transactions from the lowest dollar amount to the highest dollar amount.

•   For customer-initiated items, such as checks and ACH transactions, we process such transactions from the lowest dollar amount to the highest dollar amount.

•   For Bank service fees and Bank penalty fees, we process such transactions from the lowest dollar amount to the highest dollar amount (within each category).

**We may change the categories or the processing order of one (1) or more of the categories at any time without notice to you, provided that such categories and processing order comply with applicable law, rule or regulation.** If there are insufficient available funds to cover some of the withdrawals or debits presented against your Account, such items will be handled in accordance with our overdraft procedures or any other agreement you may have with us (such as an Overdraft Protection Agreement). Even if we choose to pay one (1) or more overdrafts, we are not obligated to cover any future overdrafts. We may determine the balance of your Account in connection with determining whether payment of an item will create an overdraft at any time between the earlier of: (1) the time the item is presented to us for payment (by electronic or other means) or the time we receive notification that the item has been deposited for collection in another financial institution; and (2) the deadline for us to take action on the item. We are not required to determine your Account balance more than one (1) time during this period. A per item service charge may be assessed on any item that will overdraw the available Account balance, regardless of whether we pay or dishonor (i.e., return) the item. You agree immediately upon notice from us to deposit funds sufficient to cover any overdraft plus service charges, if required. We will not be liable for the dishonor of any item when the dishonor occurs because we setoff a debt against your Account. We also may refuse to allow a withdrawal if there is a dispute about the Account (unless a court has ordered us to allow the withdrawal), the Account is garnished or attached, the Account has been pledged as collateral for a debt, the availability of the funds on deposit cannot be verified, any required documentation has not been presented, or you fail to repay an obligation to us on time.

(3)   **Notice Requirements –** We retain the right to require you to give at least seven (7) calendar days' notice in writing prior to any intended withdrawal from your Account. Although we usually pay withdrawals or checks without notice on your Account, doing so does not mean that we give up our right to require you to provide such prior written notice.

(4)   **Postdated Items –** You agree that when you write a check you will not date the check in the future. If you do and the check is presented for payment before the actual date on the check, we may pay it or return it unpaid. If you do not want us to pay a post-dated check, you must place a stop payment order on it (see Sections V.I. (Stop Payment Orders for Checks) and X.B.10 (Stop Payments on ATM, POS or Debit Card Transactions). You agree that if we pay the check, the check will be posted to your Account on the date we pay the check, even though the posting date is prior to the date shown on the check. You further agree that we are not responsible for any loss to you in doing so. If we are required by state law not to honor a postdated check after advance notice from you, you agree to give us advance notice early enough for us to act on it, to do so in writing, and to specify the date, exact amount, and number of the check, along with the name of the payee. You agree that we may return a postdated check to the presenter.

(5)   **Stale Checks –** We reserve the right to pay or dishonor a check more than six (6) months old without prior notice to you. We have no duty to discover, observe, or comply with stale checks. If you do not want us to pay a stale-dated check, you must place a stop payment order on it.

(6)   **Power of Attorney –** For purposes of this subsection, the person executing a power of attorney will be referred to as the "principal," and the person acting for the principal under the power of attorney will be referred to as the "agent." If you desire to grant someone power of attorney over your Account, we ask that you complete a power of attorney form that is legally binding

within the State of Texas ("Power of Attorney") in accordance with Texas Estates Code Chapter 751.

We may accept any Power of Attorney that we believe was executed by you and may act on instructions we receive under such form. However, you agree to reimburse us for all claims, costs, losses and damages that we incur in accepting and acting on any Power of Attorney that we believe you executed. When we accept a Power of Attorney we may continue to recognize the authority of your agent as attorney-in-fact until we receive written notice of revocation from you and we have had a reasonable time to act in response to such notice.

We reserve the right to refuse to honor any Power of Attorney you grant that is presented to us under the reasons for refusing acceptance as set forth in Texas Estates Code Section 751.206. Frost Bank shall have no liability to you for refusing to accept a Power of Attorney if such refusal is in accordance with Texas Estates Code Section 751.206, and we provide you with the "Written Statement of Refusal of Acceptance" as required under Texas Estates Code Section 751.207. We also reserve the right to require additional information, documentation or actions from you or the agent in accordance with our rights to do so under Texas Estates Code Section 751.201 and Sections 751.203 – 205 to satisfy any questions or concerns we may have regarding a Power of Attorney submitted to us. For example, we may ask the agent presenting the Power of Attorney to us to: (i) provide us a certification, under penalty of perjury, of any factual matter concerning the principal, agent, or Power of Attorney; (ii) provide us an opinion of counsel regarding any matter of law concerning the Power of Attorney that we specifically inquire about to the agent in writing; or (iii) provide us an English translation of the Power of Attorney if the original Power of Attorney is any language other than English.

We may also restrict the types or sizes of transactions we permit an agent to conduct. We may require a separate form for each agent and for each Account for which you want to grant a Power of Attorney.

(7)   **Agents –** Unless explicitly provided for in a Power of Attorney executed by the principal, an agent cannot appoint another agent, including, but not limited to, a convenience signer.

(8)   **Signatures –** We have adopted commercially reasonable automated collection and payment procedures for processing checks for collection or payment that are in accordance with procedures commonly used in the financial services industry so that we can process the greatest volume of items at the lowest possible cost to our customers. Automated processing means that in almost all cases we will not visually inspect checks to verify signatures or other information. We have no duty to visually inspect signatures or other information on a check presented for payment, and other than the signature of the drawer, the identification of the payor bank and payee, the amount (numeric over words if contradictory) and any MICR encoded information, we have no duty nor are we bound to look at any other information on the check and can disregard such information in our sole discretion. In addition, you agree that we do not fail to exercise ordinary care in paying an item solely because our procedures do not provide for the sight examination of items with a face amount below an amount determined solely by us from time to time. You authorize us to store and use Signature Card information in any reasonable form we deem necessary, including any digitized signature capture or electronic storage process.

(9)   **Multiple Signatures –** We are not required to monitor or enforce any multiple- signature requirement for individuals, even if your Signature Card specifies that multiple signatures are required or you have otherwise instructed us to do so.

(10)   **Facsimile Signatures –** If you use a procedure or mechanism that causes checks to be drawn on your Account(s) (such as, but not limited to: signature stamp; typed signature; facsimile signature; desktop publishing, digitized, or computer software generated signature; notation; or mark or other form of mechanical symbol (collectively, the "Mark") that is not the signature that is on the Signature Card that you signed when you opened your Account, you are adopting such Mark as your signature and authorizing us to pay checks upon which the Mark appears or purports to appear. You should understand, however, that it is easier for someone to imitate, duplicate, counterfeit, or gain unauthorized access to, or otherwise manipulate, a form or mechanical signature than it is for someone to imitate, duplicate, counterfeit, or gain unauthorized access to, or otherwise manipulate, a unique and distinctive signature. For this reason, by adopting a form of Mark, you agree you shall have the sole responsibility for maintaining security of the Mark and the device by which the Mark is affixed, and you are assuming all risk of loss resulting from the unauthorized use and or forgery of the Mark, and we will not be liable to you if use of the Mark was unauthorized. Furthermore, you are explicitly authorizing us to pay any and all checks presented against your Account which contain any mechanical signature which reasonably resembles the Mark you have adopted:

•   Regardless of whether the Mark is actually that which you have adopted;

•   Regardless of how or by whom the Mark was affixed; and

•   Regardless of whether the check, which bears or purports to bear the Mark was, in fact, authorized by you.

You are responsible even if the size or color of the Mark is different from that of any signature previously presented to us. You agree to indemnify and hold us and our correspondent banks harmless against any and all losses, damages, claims, liability, costs, and expenses which we or they may suffer arising directly or indirectly out of the misuse, unlawful or unauthorized use of the Mark, regardless of whether you have been negligent. We may pay the withdrawal and may charge your Account for it. You agree to reimburse us (and we may charge your Account) for all claims, costs, losses and damages, including attorneys' fees, that result from our payment of a withdrawal bearing either a facsimile that resembles or purports to bear your signature or Mark or a facsimile that we believe you authorized. If you use any Mark, you agree to deliver a sample to us upon our request.

However, you are still liable for all uses of the Mark, regardless of whether you have provided a sample of the Mark to us.

(11)    **Preauthorized Drafts –** If you voluntarily give information about your Account (such as our routing number and your Account number) to a party who is seeking to sell you goods or services for payment of such goods and services, even if you do not physically deliver a check to the party, any debit to your Account initiated by the party to whom you gave the information is deemed authorized by you.

(12)    **Converting Checks To Electronic Debits –**

(1) Some businesses, including merchants, retailers and billers for services, convert original paper checks that you give them into electronic debits (sometimes referred to as an electronic check) through use of Accounts Receivable Conversion ("ARC"), Point of Purchase ("POP") conversion, or Back Office Conversion ("BOC"). Such electronic debits generated by ARC, POP or BOC conversion are separate and distinct from Substitute Checks discussed previously, and are governed by separate laws rules and regulations for electronic debits. ARC conversion may occur when you mail your check to a biller (e.g., credit card company, utility company) who uses the check information to initiate an electronic debit against your Account and may, at the biller's discretion, destroy your check. POP conversion may occur at a Point- of-Sale ("POS") location where the business or merchant will have posted notice that your check will be converted to an electronic debit and may have you sign a receipt and may return your check to you after scanning your check. If the business uses POP to take a blank check to initiate an electronic debit at the POS, the business should give you notice of the POP conversion and return the voided check to you. You should treat the voided check with care because someone else who obtains possession of it could use the information to initiate additional debits against your Account.

BOC conversion may occur at a retailer who posts notice that your check may be converted to an electronic debit via the retailer's back-office processes, and the retailer or merchant may provide you with written notice of these conversion procedures and may, at the retailer's discretion, destroy your check. A business that receives your check by mail or otherwise, and converts it to an electronic debit via ARC, POP or BOC should give you notice of the conversion, and such business has the option to destroy the Original Check.

(2) If you authorize the conversion of your check into an electronic debit under one of the situations described above, funds may be withdrawn from your Account sooner than the funds would have been withdrawn had the original paper check been sent to us for payment. We charge any such electronic debit to your Account when we receive it. We may receive the electronic debit to your Account immediately after the business enters the transaction so you may have a reduced right to stop payment and you may incur an overdraft if you do not have sufficient funds in your Account to cover the amount of the check at the time you write the check or authorize the transaction. Also, you will not receive either your Original Check or a Substitute Check back from us in your monthly statement since no original or Substitute Check is sent to us for processing. While these electronic debits are listed on your Account statement, the electronic debit of the funds from your Account will not appear under the "Checks Paid" section of your monthly statement. Instead, the debiting amount, along with the corresponding check number (if available) will appear under the "Other Withdrawals/Debits" section of your statement.

(3) If your Account is a Personal Account, then these electronic debit transfers are governed by the Electronic Funds Transfer Act and the Consumer Financial Protection Bureau's Regulation E ("Regulation E"), and all electronic checks (both debits and credits) are also governed by the Operating Rules and Operating Guidelines of the National Automated Clearing House Association ("NACHA") and are also subject to the separate Frost Bank Electronic Funds Transfer Agreement and Disclosure as described in Section X.B. (Required Disclosures Under Electronic Funds Transfer Act and the Consumer Financial Protection Bureau's Regulation E).

(13)    **Re-presented Checks –** You may authorize a merchant to create an electronic withdrawal from your Account for the amount of your check when the original paper check is returned to the merchant for insufficient or uncollected funds. Checks used in these types of transactions will not be returned with your statement. The entry for the debit of the funds will appear under the "Other Withdrawals/Debits" section of your monthly statement. The transaction is not covered by the Electronic Funds Transfer Act or Regulation E, but is governed by the Uniform Commercial Code ("UCC") and other applicable Federal Reserve Board Regulations.

(14)    **Electronic Checks –** You may give a merchant information about your checking Account over the phone or over the Internet and authorize them to create an electronic withdrawal from your Account. Funds will normally be withdrawn from your Account the next Business Day. The transaction will appear in the "Other Withdrawals/Debits" section of your monthly Account statement. If the Account is a Personal Account, then these transfers are governed by the Electronic Funds Transfer Act and Regulation E, and are also governed by the NACHA Operating Rules and Operating Guidelines and are also subject to the separate Frost Bank Electronic Funds Transfer Agreement and Disclosure as described in Section X.B. (Required Disclosures Under Electronic Funds Transfer Act and the Consumer Financial Protection Bureau's Regulation E).

(15)    **Check Legends –** We may disregard information on any check or item other than the signature of the drawer, the identification of the drawee financial institution and payee, the amount, the endorsements, and any other information that appears on the MICR line. In addition, we are not responsible to take action on, or otherwise to notify you of restrictive language placed on checks or other items, including, but not limited to, terms such as "Void after 90 Days," "Paid in Full," "Two Signatures Required," "Void Over $100" or similar statements. In accordance with commercially reasonable banking industry standards and

practices, most checks and other items are processed through automated processing and, except in limited circumstances and in our sole discretion, most items are not individually examined. You agree that we act within commercially reasonable banking industry standards and practices by processing most checks and other items through automated processing systems.

## F.   Checking Subaccounts

For each checking Account, we establish a master account and two subaccounts. All information made available to you about your checking Account will be at the master account level. The separation of the two subaccounts is for regulatory accounting purposes and does not affect your use of your checking Account in any way. All of our rules, regulations, and disclosures (including any provisions relating to interest) apply to your checking Account as a whole (i.e., at the master account level), without reference to the two subaccounts. The subaccounts will be comprised of a savings account and a transaction account. At the beginning of each statement period, we will allocate funds between the two subaccounts as we deem appropriate. Checks received by us that are drawn against your master account will be presented for payment against the transaction subaccount. Funds will be transferred from the savings subaccount to cover checks presented against the transaction subaccount as may be needed. On the sixth (6th) transfer from the savings subaccount to the transaction subaccount during a given statement period, all of the funds on deposit in the savings subaccount will be automatically transferred to the transaction subaccount. Use of the savings subaccount as a holding account may resume at the beginning of the next statement period.

## G.   Interest-Bearing Checking Accounts

We may choose, in our sole discretion, to offer interest-bearing Personal Accounts, and interest-bearing Business Accounts (Accounts for sole proprietors, business partnerships, professional associations, limited liability companies, for-profit corporations, non-profit entities and governmental units). In addition, if we offer interest-bearing Accounts, such Accounts may also be held by a for-profit organization serving in a fiduciary or trustee capacity for a person or an entity that is itself permitted to hold an interest-bearing checking Account, and by an organization that is operated primarily for religious, philanthropic, charitable, educational, or other similar purpose.

## H.   Stop Payment Orders for Checks

Subject to certain limitations, any Account Holder or Account Holder's agent may provide an oral or written stop payment on any check payable from your Account, whether drawn by you or any other Account Holder.  The stop payment request will be effective if we receive the order at such time and in such manner as to afford us a reasonable opportunity to act upon the stop payment order.

We require you to provide the date of the check, the exact amount, the check number (or range of checks), and the name of the payee for all stop payment orders.  If you give us incorrect information, we will not be liable for failing to stop payment on the check.

Stop payment orders are in effect for six (6) months and will automatically expire at the end of six (6) months from the date of the stop payment order, and you must ask us to renew any stop payment order that has expired.  Each renewal of a stop payment order will be treated as a new stop payment order. We may charge you a fee for each stop payment order. Our acceptance of a stop payment order will not constitute a representation that the check has not already been paid or that we have a reasonable opportunity to act upon the order.

Your stop payment order will not be effective if we have already certified, paid or otherwise become responsible for the check. For example, we cannot stop payment on a check we have already cashed or a deposited check where funds have already been withdrawn.

You may not stop payment on an official, certified, cashier's, or teller's check issued by us, or request us to stop payment if we have otherwise become accountable for the check.  In addition, you may not stop payment on checks governed by separate agreement, such as a check guaranty agreement.

## I.   Types of Account Ownership

Based upon the type of Account ownership that you have designated, the following terms and conditions apply:

NOTICE TO YOU: THE TYPE OF ACCOUNT YOU SELECT MAY DETERMINE HOW PROPERTY PASSES ON YOUR DEATH. YOUR WILL MAY NOT CONTROL THE DISPOSITION OF FUNDS HELD IN SOME OF THE FOLLOWING ACCOUNTS. You may select some of the following Accounts by placing your initials next to the Account you select on the "Texas Uniform Single or Multiple-Party Account Selection Form."

(1)   **Individual Accounts –** An Individual ("Single-Party") Account is an Account in the name of one (1) depositor only. This section pertains to individual Accounts:

(i)     **Single-Party Account without P.O.D. (Payable on Death) Designation – If you have opened this type of account, then you are the sole owner of the Account.** On your death, ownership of the Account passes as a part of your estate under your will or by intestacy.

(ii)    **Single-Party Account with P.O.D. (Payable on Death) Designation –** If you have opened this type of Account then you are the sole owner of the Account. On your death, ownership of the Account passes to the payable-on-death ("P.O.D.") beneficiaries you have designated. The Account does not become part of your estate. A sole proprietorship may open a Single-Party Account and may contain a P.O.D. designation.

(iii)   **Health Savings Account –** We can serve as your custodian for a Health Savings Account. A Health Savings Account is an Account permitted by the federal government which qualifying individuals may be able to use to obtain tax advantages when saving and paying for medical and other permitted health expenses. Despite the name, these Accounts can be checking Accounts, and not just savings Accounts. Only natural persons can own this type of Account, and you must execute a separate Health Savings Account Custodial Account Agreement to establish a Health Savings Account. This Account may only be owned by one (1) individual, but you can give your spouse, or another agent, the power to make transactions with respect to this Account. If you choose to designate a beneficiary, you must complete a beneficiary designation form at the time you open this Account. If your beneficiary is your spouse who is still alive at the time of your death, then the Account will thereafter be treated as your spouse's Health Savings Account, and no tax on the Account balance will be due at your death. If your spouse predeceases you, or if someone other than your spouse is named as your beneficiary, including your estate, then tax may be due on the balance remaining at your death.

(2)     **Multiple-Party Accounts –** Our rights and liabilities for payment of any sums on deposit in these types of Account shall be governed by the Texas Estates Code, as amended from time to time. This section pertains to multiple-party Accounts:

(i)     **Joint Account Ownership –** An Account with two (2) or more Account Holders is a joint ("multiple-party") Account.

(a)     **Multiple-Party Account without Right of Survivorship –** If this is the type of Account you have with us, then you own the Account in proportion to your net contributions to the Account. Frost Bank may pay any sum in the Account to a Party, including a Party's Power of Attorney or agent, at any time. On your death, your ownership passes as a part of your estate under your will or by intestacy.

(b)     **Community Property without Right of Survivorship –** In Texas, this type of Account only applies to persons who are married to each other, both of whom need to be named on the Account. If you have designated your Account as a community property Account without right of survivorship, the money in your Account is the community property of you and your spouse. You will need to select the Multiple-Party Account Without Right of Survivorship designation on the "Texas Uniform Single- or Multiple-Party Account Selection Form" according to Section 113 of the Texas Estates Code. The ownership of the community property Account during your lifetime and after your death is determined solely by state law and may be affected by a will.

(c)     **Multiple-Party Account with Right of Survivorship –** If this is the type of Account you have with us, then you and the other parties to this Account own the Account in proportion to each of your net contributions to the Account. We may pay any sum in the Account to a Party, including a Party's Power of Attorney or agent, at any time. On your death, your ownership of the Account passes to the surviving parties.

(d)     **Community Property with Right of Survivorship –** Texas law allows persons who are married to each other to agree in writing that community property funds in an Account shall become the property of the surviving spouse on the death of either spouse. If you and your spouse have this type of Account and desire the spouse to have right of survivorship in those funds upon the death of either spouse, you each will need to choose the Multiple-Party Account With Right of Survivorship designation on the "Texas Uniform Single- or Multiple-Party Account Selection Form" according to Section 113 of the Texas Estates Code. However, you should consult your own attorney if you have any questions regarding community property laws and the division of property at the death of either spouse.

(e)     **Multiple-Party Account with Right of Survivorship and P.O.D. (Payable on Death) Designation –** If this is the type of Account you have with us, then you and the other parties to the Account own the Account in proportion to each of your net contributions to the Account. We may pay any sum in the Account to a Party, including a Party's Power of Attorney or agent, at any time. On the death of the last surviving Party, the ownership of the Account passes to the P.O.D. beneficiaries.

(ii)    **Convenience Account –** This type of Account is often used with family members when the owner needs help managing the Account, or simply wants a contingency signer. To select a convenience Account, you will need to choose the convenience Account option of the "Texas Uniform Single- or Multiple-Party Account Selection Form" according to Section 113 of the Texas Estates Code. If you select a convenience Account, you own the Account, but your convenience signer is authorized to conduct Account transactions. If you have this type of Account, your convenience signer has no ownership of the Account, and may not pledge or otherwise create a security interest in your Account(s). On your death, ownership of the Account passes as part of your estate by will or by intestacy. We may pay funds in the Account to the convenience signer or at the convenience signer's direction either before we receive notice of your death, or before we receive written notice signed by you that the authority of the convenience signer has been revoked and instructing us to remove the convenience signer from your Account. We will not be liable for any actions of the convenience signer until we have received either notice of the Account owner's death, or written

notification of the revocation of the convenience signer's authority, and have had a reasonable time to act on such notice. Any payment to the convenience signer will not affect your ownership of the Account. We reserve the right to verify any transaction carried out by a convenience signer with the owner(s) of the Account.

(iii) **Totten Trust Account –** If you, either alone or in combination with someone else, are named trustee(s) to this type of Account, then you own the Account in proportion to each of your net contributions to the Account. Any named trustee may withdraw funds from the Account. A beneficiary may not withdraw funds from the Account before all trustees are deceased. On the death of the last surviving trustee, the ownership of the Account passes to the beneficiary. The trust Account does not become part of your estate and does not pass under your will or by intestacy, unless you were to survive all of the beneficiaries and all other trustees. We may pay any sum in the Account to a Party, including a Party's Power of Attorney or agent, at any time.

With any Account type, each joint Account Holder, designated agency signer (see below for description of Agency Account), convenience signer, and Power of Attorney or agent acting on behalf of a joint Account Holder, without the consent of any other Account Holder or signatory, may, and hereby is authorized by every other joint Account Holder, to make any transaction permitted under the Agreement, including without limitation: to withdraw all or any part of the Account funds; to (except for agency signers and convenience signers) pledge the Account funds as collateral to us for any obligation, whether that of one (1) or more Account Holders or of a third party; to endorse and deposit checks and other items payable to any joint Account Holder; to give stop payment orders on any check or item, whether drawn by that Account Holder or not; and to close the Account, with the disbursement of Account proceeds as instructed by the Account owner or joint Account Holder. Each joint Account Holder is authorized to act for the other Account Holder(s) and we may accept orders and instructions regarding the Account from any joint Account Holder. If we believe there is a dispute between joint Account Holders or we receive inconsistent instructions from the Account Holders, we may suspend or close the Account, require a court order to act, and/or require that all joint Account Holders agree in writing to any transaction concerning the Account. Each Joint Account Holder's obligations under the Agreement are joint and several. This means that each joint Account Holder, but not a designated agency signer or convenience signer, is fully and personally obligated to Frost Bank under the terms of the Agreement, including liability for overdrafts and debit balances, irrespective of which joint Account Holder or signatory benefited from the withdrawal. If you establish a joint Account without the signature of the other joint Account Holder(s), you agree to hold us harmless for our reliance upon your designation of the other joint Account Holder(s) listed on our documents. Further, the Account is subject to the right of setoff as further described in Section VI.M. below (Right of Setoff).

(3)   **Additional Account Types –**

This section applies to other deposit Account types:

(i)   **Formal Trust Account –** A Formal Trust Account is an Account held by you and one (1) or more other persons, each acting as a trustee for the benefit of one (1) or more beneficiaries according to a written trust agreement. Upon our request, you will supply us a copy of any trust agreement covering the Account. We act only as custodian of the trust funds and we are not acting as a trustee, nor do we need to inquire as to the powers or duties of the trustee(s). You and any other trustee or person opening the Account, in your individual capacity and jointly and severally, agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorneys' fees, we may suffer or incur arising out of any action or claim by any beneficiary or other trustee with respect to the authority or actions taken by you in handling or dealing with the Account.

(ii)   **Uniform Transfer to Minors –** If you have established the Account as a custodian for a minor beneficiary under the Texas Uniform Transfers to Minors Act, your rights and duties are governed by that act. We will not allow you to pledge the Account as collateral for any loan to you. We will hold all deposits in the Account for the exclusive benefit of the minor. You agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorneys' fees, we may suffer or incur arising out of any action or claim by any beneficiary or other custodian with respect to the authority or actions taken by you in handling or dealing with the Account.

(iii)   **Agency Account –** An Agency Account is an Account to which funds may be deposited and withdrawn by an agent designated by the owner of the Account. If you are the agent, then you have the authority to conduct transactions on the Account, except that the agent may not pledge or otherwise create a security interest in the Account. In addition, you will not have an ownership interest in the Account. On death of the Account owner, ownership of the Account passes as part of the Account owner's estate by will or by intestacy. The owner of an Agency Account may revoke the agent's authority over the Account at any time by notifying us in writing. We will not be liable for any actions of the agent until we have received either notice of the Account owner's death, or written notification that the Account owner has revoked the agent's authority, and have had reasonable time to act on such notice. An Agency Account designation may be combined with one (1) of the other forms of Account ownership, except that it may not be combined with a convenience Account. We reserve the right to verify that any transaction carried out by an agent with the owner(s) of the Account.

(iv)   **Business Accounts –** If the Account is a Business Account (for example, it is owned by a corporation, partnership, limited liability company, sole proprietorship, unincorporated association, non-profit entity, etc.), then the Account Holder must provide us with a copy of the business entity's certificate of incorporation or other comparable organizational document, and evidence to our satisfaction of the authority of the individuals who sign the Signature Card to act on behalf of the Account Holder. On any

transactions involving the Account, we may act on the instructions of the person(s) authorized in the resolutions, banking agreement, or certificate of authority to act on behalf of the Account Holder. If you operate as a sole proprietorship, you agree to notify us promptly of any change in the name of the business owner, in the physical address of the business, in the home address of the business owner, in the driver's license number of the business owner, or in the business owner's personal identification card number issued by the applicable Department of Public Safety. You further agree to notify us in writing of any changes in the person(s) authorized to act on behalf of the Account Holder, and change in the business entity's certificate of incorporation or other organizational document, or the form of ownership. If we receive conflicting instructions or a dispute arises as to authorization with regard to the handling of the Account, you agree we may place a hold on the Account until such conflict or dispute is resolved to our satisfaction and we will not be liable for dishonored items as a result of such hold.

(v)   **Fiduciary Accounts –** With respect to all fiduciary Accounts, including, but not limited to, estate Accounts, guardianship Accounts, and conservatorship Accounts, and any formal trust Account, Texas Uniform Transfers to Minors Act Account, or Agency Account, at any time we may require such documents and authorizations as we may deem necessary or appropriate to satisfy us that the person(s) requesting or directing the withdrawal of funds held in the Account have the authority to withdraw such funds. This applies at the time of Account opening and at all times thereafter.

(vi)   **Attorney Client Trust – (IOLTA)** Subject to applicable law, an Attorney Client Trust Account (also referred to as an "Interest On Lawyer's Trust Account," or "IOLTA") is an Account set up by an attorney or law firm to hold client or third-party funds in trust, separate from the attorney's or law firm's funds. Upon our request, the authorized signers for an Attorney Client Trust Account will provide documentation required by applicable state law and applicable bar association (or similar entity) rules. We act only as custodian of the trust funds and are not acting as a trustee, nor do we need to inquire as to the powers or duties of the attorney or law firm as trustee(s). The attorney, law firm, or any authorized individual on the Account agrees to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure, including reasonable attorney's fees, we may suffer or incur arising out of any action or claim by any beneficiary or third party with respect to the authority, actions, or inaction taken by the trustee(s) or authorized individuals in handling or dealing with the Account. Additional Account terms are governed by a separate agreement.

## J.   Time Deposits

If your Account is a time deposit, you have agreed to keep the funds on deposit until maturity. If your Account has not matured, any withdrawal of all or part of the funds from your Account may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty provided in the Schedule will apply.

(1)   **Penalty –** The early withdrawal penalty is calculated as a forfeiture of part of the accrued interest that has or would be earned on the Account. If your Account has not yet earned enough interest so that the penalty can be deducted from earned interest, or if the interest has already been paid, the difference will be deducted from the principal amount of your Account. For fixed rate Accounts, we will use the rate in effect for your deposit.

(2)   **Exceptions –** We may let you withdraw money from your Account before the maturity date without an early withdrawal penalty: 1) when one (1) or more owners on the Account dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction; 2) when the Account is an Individual Retirement Account ("IRA") established in accordance with Title 26 U.S.C. Section 408 and the money is paid within seven (7) calendar days after the Account is opened; 3) when the Account is a Keogh Plan, if you forfeit at least the interest earned on the withdrawn funds; 4) if the time deposit is an IRA or Keogh Plan established pursuant to Title 26 U.S.C. Section 408 or Title 26 U.S.C. Section 401, when you reach age 59 1/2 or become disabled; or 5) within an applicable grace period (if any).

## K.   Our Liability

You agree that, other than our liability under Check 21 Regulations, if we do not properly complete a transaction according to the Agreement, we will not be liable in any event for losses or damages in excess of the amount of the transaction, and we will never be liable if circumstances beyond our control prevent the transaction, or if the funds in your Account are or may be subject to Legal Process or other claim. Except to the extent expressly provided for in the Check 21 Regulations, in no event will we be liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind. In receiving checks from you for withdrawal or deposit, we act only as your agent. You are responsible for the condition of a check or item when you issue it. If a check or item is returned or payment is delayed as a result of any writing or marking that you or a prior endorser placed on the front or back of the check or item, you will be responsible for any cost and liabilities associated with such return or delay. If you do not have sufficient available funds to recover a returned item, we may overdraw your Account(s). We are not liable to you if there are insufficient funds in your Account due to a hold or charges related to a returned item. You agree to repay immediately an overdraft caused by a return of a cashed or deposited item. We reserve the right to refuse any item for deposit, to reverse credit for any deposited items or to charge your Account for items should they become lost in the collection process.

## L.   Right of Setoff

Subject to applicable law, we may exercise our right of setoff that we are entitled to exercise under common law, under this

Agreement and under statute (see Texas Finance Code Section 34.307), or security interest to recover amounts you owe us from any and all Accounts you maintain with us or with our affiliates before we pay checks or other items drawn on the Account(s), without notice to you, except that this provision does not apply to any IRA Keogh Plan, certain Trust Accounts (but excluding Totten Trust Accounts), or Health Savings Accounts. We are not liable to you if these actions cause your Account to be overdrawn and checks or other items are dishonored because of insufficient funds. As permitted by applicable law, we may exercise our right of setoff for any liability or debt of any of you, whether the Account is owned jointly or individually; whether the liability or debt is direct or contingent and whether now or hereafter existing; and whether the liability or debt arises from overdrafts, endorsements, guarantees, loans, attachments, garnishments, levies, attorneys' fees, or other obligations. However, under Article XVI, Section 50(a)(6)(H) of the Texas Constitution, we may not setoff against any of your Accounts for a liability arising from a home equity loan secured by Texas Homestead Property. If you are a sole proprietor, we may charge any of your Personal or Business Accounts. If you are a business partnership, we may also charge the Personal Accounts of any general partner. If the Account is a joint or any other type of multiple-party Account, each joint or multiple-party Account Holder authorizes us to exercise our right of setoff against any and all Accounts of each Account Holder. We may use funds held in multiple-party Accounts to repay the debts on which any one of you is liable, whether jointly with another or individually. We may charge any such debt against your Account at any time, without regard to the origin of deposits to the Account or beneficial ownership of the funds.

## M.  Dormant Accounts

If you have not made a withdrawal from, or a deposit to, your Account for an extended period of time and we have been unable to contact you, your Account may be classified by us as dormant Account. Subject to applicable law, we may charge a dormant Account fee on the Account, and the Account will be presumed to be abandoned. In accordance with applicable Texas law, funds in abandoned Accounts will be remitted as unclaimed property to the custody of the Texas State Comptroller's Office (or any subsequently applicable state agency), and we will have no further liability to you for such funds. We reserve the right not to send statements on Accounts we consider dormant.

## N.  Account Statements

You are responsible for promptly examining your Account statement each statement period, reviewing all transactions – deposits/credits, checks paid, and other withdrawals/debits – in the Account statement, and reporting any irregularities to us. The Account statement shall be considered correct for all purposes, and we will not be liable for any payment made and charged to your Account, unless you notify us in writing within certain time limits after the statement is made available to you by mail, sent to you at your statement mailing address, made available to you through Online Statement Delivery (if you are enrolled in Online Statement Delivery), posted in Frost Online Banking, or otherwise made available to you. Statements (and any accompanying items) shall be deemed made available to you by mail on the third (3rd) Business Day after the date when we mailed the statement to your statement mailing address, and statements shall be deemed made available to you through Online Statement Delivery (if applicable) on the date when the statement is posted through Online Statement Delivery. Those time limits are applicable as follows:

(1)   Unless a longer time period is required by statute or governmental regulation, such as under Regulation E, and the time period may not be modified by agreement, you must notify us in writing within thirty (30) calendar days after we made the statement available to you by mail, through Online Statement Delivery (if applicable) or  if you have requested us to hold your Account statements (a "Statement Hold Request")  if:

•   An Item or other transaction listed is one you did not authorize, is altered, or is fraudulent;

•   A deposit is missing from the Account statement;

•   A Wire Transfer listed is one you did not authorize, is altered, or is fraudulent;

•   Your Account statement contains any errors; or

•   You did not receive your scheduled Account statement.

(2)   If you do not comply with the requirements above, we are not required to reimburse you for any claimed loss, and you cannot bring any legal claim against us in any way related to the Item or errors. In addition, you must notify us promptly if you do not receive an Account statement. If you fail to notify us of any unauthorized, altered, fraudulent, or missing Item or transaction within thirty (30) calendar days after we made the Account statement available to you by mail, by Online Statement Delivery (if applicable) or pursuant to a Statement Hold Request, and such Account statement lists an unauthorized, altered, or fraudulent Item or transaction or fails to list a deposit, we are not required to reimburse you for unauthorized, altered, fraudulent, or missing Items or transactions by the same person that we pay after that time. Failure to comply with the requirements above may prohibit you from recovering certain funds that were transmitted electronically, and may also preclude us from being able to return ACH transactions in accordance with NACHA Operating Rules and Operating Guidelines.

(3)   We will not be liable for any Substitute Check that is altered or any signature that is forged or unauthorized unless you notify us within forty (40) calendar days after we made the statement available to you by mail or made the statement available to

you through Online Statement Delivery or pursuant to a Hold Request.

For Business Account customers, you understand and agree that any employee or applicant for a job responsible for handling your financial affairs (including processing, writing or receiving checks, handling Account statements or acting otherwise in a responsible manner regarding your financial affairs) has been asked specifically whether they have ever been convicted of a felony, that a thorough background check of such employee or applicant has been conducted, that a system of reasonable financial controls is in place, and that you have instituted a program that encourages your employees to report fraudulent or dishonest activities to you or company management. Unless otherwise set forth in this Agreement, the Texas Business and Commerce Code shall govern liability for any losses regarding your Business Account.

If you have made a Statement Hold Request, you acknowledge and agree that we will hold your Account statement(s) rather than mailing them to you. You expressly acknowledge and agree: (1) our implementation of your Hold Request means any Account statement received and held by us per your Hold Request is deemed delivered to you as of the date the statement is first made available and delivered to the Statement Call division, regardless of when you physically pick up the statement from us; (2) you are solely responsible for reviewing any Account statement(s) for which you have made a Hold Request; and (3) a Hold Request does not delay, postpone or otherwise affect or modify any provisions of this Agreement regarding your responsibilities and relevant deadlines for notifying us of any Account statement irregularities or potentially unauthorized, erroneous or fraudulent transfers, and any time period for any applicable notice deadline begins running when the statement is first made available to you, which, in the case of any Hold Request, is the date the Statement Call division receives the statement. In addition, we have the right to destroy your statements if you have not claimed them within sixty (60) calendar days.

If we Truncate (as defined in Section VII.B. (Information Regarding Digital Deposits)) your checks, you understand that neither your Original Checks nor Substitute Checks will be returned with your Account statement. You agree that our retention of checks does not alter or waive your responsibility to examine your Account statements or change the time limits for notifying us of any errors.

Account statements sent or made available to any Account Holder are deemed to be received by all Account Holders. If Account statements are held by us in accordance with a Hold Request or because you fail to provide us with a current address, they will be deemed delivered to you when they are either prepared (if held by us) or delivered to the Statement Call division (if held pursuant to a Hold Request from you), mailed (for return mail), or otherwise made available to you.

Any written notice you give to us regarding your Account statement, or a problem with your Account statement, is effective when it is actually received by us and we have had a reasonable opportunity to act on it. Any written notice we give to you regarding your Account statement is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address.

If any problems arise regarding your Account, you agree to provide us with all information necessary for us to investigate the alleged error or unauthorized transaction. You also agree to promptly file a report with proper law enforcement agencies and otherwise to provide supporting affidavits, evidence and testimony we reasonably request in connection with the alleged error or unauthorized transaction. If you fail to comply with any of the above, we are not obligated to reimburse you for any claimed loss, except for consumer transactions that may be governed by Regulation E.

## O.   Positive Pay Services

If you are a Business Account customer and choose to participate in our Positive Pay services, which are designed to help prevent check fraud, and you fail to utilize or follow the procedures required for those services, you will assume the risk that checks presented against your Account may be forged or altered, to the extent that the services we offered may have prevented any loss. You understand and agree that should you implement the Positive Pay services incorrectly or if you fail to follow the required procedures for the Positive Pay services, you will be precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that the Positive Pay Service is designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

## P.   Wire Transfers and Automated Clearing House (ACH) Transactions

With respect to Wire Transfers or other transfers of funds not governed by the Electronic Funds Transfer Act, you agree to enter into and comply with our "Funds Transfer Agreement" for Wire Transfers (if applicable) and to comply with this section and any of our Security Procedures designed to verify the authenticity of such Wire Transfers or other transfers. Security Procedures may include, but are not limited to, call-back procedures, request for personal identification, password, PIN number, telephone code words, or any other security code, algorithms, encryption or similar security devices. You agree to be bound by any payment order for any Wire Transfers or other transfers not governed by the Electronic Funds Transfer Act, whether or not such payment order is authorized, issued in your name and accepted and executed by us in compliance with any commercially reasonable Security Procedures as mutually agreed to by you and us. In the event that we offer you one (1) of our standard Security Procedures commensurate with the type of Wire Transfer or other transfer you request, and you reject such Security Procedures and instead opt for different Security Procedures, you hereby agree that such Security Procedures are deemed commercially reasonable and you agree you are bound by any such payment order executed pursuant to such Security

Procedures you have selected. Any receiving financial institution (including us) is entitled to rely on any Account or bank number you have provided even though that Account or bank number may identify a party different from the person or entity you have described by name in any transfer order. You agree not to use Wire Transfers or the ACH system to conduct any transaction in violation of federal or state law. You expressly warrant that no entry delivered to us will, if we accept it, cause us to be in violation of any sanction administered by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") or any applicable anti-money laundering statute, including, but not limited to, the federal Bank Secrecy Act and the USA-PATRIOT Act. With regard to any international ACH transactions ("IAT") received by you, you understand and acknowledge that these types of ACH transactions will be subject to increased scrutiny by Bank of the originator (i.e. sender) and receiver (i.e. recipient) as required by OFAC and the United States Department of Treasury's Financial Crimes Enforcement Network.

(1)    **Provisional Payment –** Credit we give you with respect to an ACH credit or Wire Transfer entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive final settlement, you agree that we are entitled to a refund of the amount credited to your Account in connection with such entry, and the party (the originator of the entry) making payment to you by such entry shall not be deemed to have paid you the amount of such entry.

(2)    **Notice of Receipt –** We will notify you of the receipt of payments in the periodic Account statements we provide to you. You acknowledge that we will not give next day notice to you of receipt of an ACH or Wire Transfer item.

(3)    **Foreign Wires –** You agree that if you request a Wire Transfer in a currency other than U.S. dollars, we will convert such amount at our current exchange rate for the foreign currency you specify. If any funds are returned to you in a currency other than U.S. dollars, we will convert the returned foreign currency into U.S. dollars at its current exchange rate for such currency at the time of the return. If we do not have current exchange rates for the particular foreign currency involved, we will use our best efforts to promptly convert the currency through reasonable commercial and/or banking channels, and you agree to pay us a reasonable fee for such services. In no event shall we be liable to you for any losses arising from currency conversions requested by you and carried out by us within a reasonable time after receiving funds for conversion.

In addition to your ability to request that a Wire Transfer be sent in a currency other than U.S. dollars, Wire Transfers that are denominated in U.S. dollars but contain instructions from you for us to send to an account denominated in a foreign currency, may be converted by us or converted by an intermediary or correspondent bank or the receiving bank, in such entity's sole discretion, into the applicable currency of the country the Wire Transfer is being sent to. If the beneficiary requires you to send payment in U.S. Dollars, you must advise us at the time of the transaction. You understand that we may receive compensation in connection with such conversion. When the conversion occurs, we, intermediary or correspondent bank, or the receiving bank, will determine, in such entity's sole discretion, the currency exchange rate. We are not responsible for the exchange rate set by an intermediary or correspondent bank or the receiving bank.

We may, at our sole discretion, determine: (1) the routing method and settlement systems (e.g. SWIFT, the Federal Reserve Wire Network ("FedWire") or the Clearing House Interbank Payments System); (2) the settlement currency (unless otherwise instructed by you); (3) intermediary and correspondent banks; and (4) appropriate fee structures in order to facilitate Wire Transfers on your behalf. We, our correspondent banks, and other banks involved in the Wire Transfer process may charge additional fees or convert currency, in some cases providing compensation to us. We may deduct our fees from your Account(s) or from the amount of the Wire Transfer. We may include your name, address and other required information within the Wire Transfer instruction, so we may comply with international and foreign payment regulations and requirements.


**Q.   Cash Vault Services and Smart Safe Services**

(1)    **Cash Vault Services –** "Cash Vault Services" allows a Business Account customer to have coin and/or currency deposits ("Vault Deposits") delivered to a remote cash vault location for processing. Cash Vault Services allows such customer to place coin orders for coin and currency and schedule delivery and pick up. You must separately contract with an armored carrier ("Carrier") that is acceptable to us to allow Vault Deposit delivery to a remote cash vault location.

The Carrier must continue to meet our vault location requirements. In our sole discretion, if Bank's requirements are not met, we reserve the right to deny Vault Deposits to be delivered to the remote cash vault location or deny order servicing for delivery of coin and currency. Customer is to maintain insurance for liability while cash is in the customer premise. Once coin and/or currency is picked up by Carrier, the Carrier accepts liability for the Vault Deposit during the transfer from the customer's location to the remote cash vault at the designated Carrier's location. At no time is the Bank liable for the contents of such transfers.

(2)    **Smart Safe Services –** "Smart Safe Services" allows a Business Account customer to deposit currency into an electronic smart safe/bill counter (the "Smart Safe") and receive provisional credit from the Bank the following Business Day. Once the Smart Safe deposit totals are received by Bank, customer's designated Account is provided with provisional credit for the corresponding Smart Safe deposit amount. Customer's Smart Safe must be "serviced" (deposits removed for verification purposes) at least once each calendar week and transported to a Bank-approved vault location for verification.

In order to utilize the Smart Safe Services, customer must contract with a Bank-approved third party service provider (the "Smart Safe Vendor") for currency removal, validation and transportation services. Customer hereby agrees to comply with its obligations under the resulting agreement ("Vendor Agreement"). The Smart Safe Vendor does not act as an agent of Bank in

performing activities for Customer.

Customer should not insert non-U.S. currency into the Smart Safe as non-U.S. currency will not be processed by the Smart Safe Vendor or Bank. Customer may not remove currency from the Smart Safe once is has been inserted. Currency will only be removed from the Smart Safe by an authorized Smart Safe Vendor representative. Within a timeframe agreed upon between Smart Safe Vendor, customer and Bank, the contents contained within the Smart Safe shall be removed by the designated Smart Safe Vendor and physically transported to a location directed and approved by the Bank for verification.

Until the Smart Safe Vendor has received and physically verified any Smart Safe deposit, Bank accepts no liability for loss of any Smart Safe deposit(s) or any losses or damages incurred by customer with respect to the Smart Safe deposit(s). This includes any losses incurred via natural acts of God, safe robberies, fire etc. Bank shall not be deemed to have finally received and accepted any Smart Safe deposit until such deposit has been physically verified by Bank or the Smart Safe Vendor at the direction of Bank. Bank shall not be liable to customer as an insurer of such property.

Customer will receive provisional credit by Bank for Smart Safe deposits the following Business Day as reported on the daily Smart Safe reports. Bank reserves the right to refuse to provide provisional credit for any Smart Safe deposits at its reasonable discretion. Upon receipt of any deposit(s), the Smart Safe Vendor will verify currency amounts removed from each of customer's Smart Safes. Customer agrees that the findings and records of the Smart Safe Vendor shall be conclusive and binding upon Customer. Furthermore, to the extent there is a conflict between the records of the Bank, the Smart Safe Vendor or customer regarding the Smart Safe deposit, the Bank's records shall control. If the amount of the Smart Safe deposit as verified by the Smart Safe Vendor differs from the amount of the Smart Safe deposit reported to Bank, Bank will debit or credit customer's Account as necessary to reflect the amount of the Smart Safe deposit as verified by the Smart Safe Vendor. The customer authorizes Bank to make such adjustments by credit or debit transaction to customer's Account(s), electronically or otherwise.

### R.   Notices

(1)   **Notice of Amendments –** You agree that from time to time we may amend the terms and conditions of this Agreement, including without limitation all rates, fees, and charges, to the extent permitted by law. We will notify you of amendments as required by law. Your use of the Account after the effective date of the amendment is your consent to the amendment. Notices will be sent to the most recent address shown on our records for your Account, or, if relevant, as provided in the agreement between you and us regarding your use of the Frost Online Banking Services or Treasury Management Services (as defined in the applicable agreement). Only one (1) notice will be given in the case of joint Account Holders, and notice to any one (1) Account Holder is deemed notice to all Account Holders.

(2)   **Account Changes –** Each Account Holder or person authorized to sign on the Account is required to notify us in writing if any Account Holder or other person authorized to sign on the Account dies or is declared incompetent by a court. You must promptly notify us of any change in your address or name. We are required to honor items drawn only on the listed Account name. Further, we are required to attempt to communicate with you only at the most recent address provided to us.

(3)   **Delivery and Receipt of Notices –** Notices sent or made available to any Account Holder are deemed to be received by all Account Holders. Any written notice you give to us regarding your Account, including any problem with your Account, is effective when such notice is actually received by us and we have had a reasonable opportunity to act on it. Any written notice we give to you is effective when it is deposited in the U.S. mail, postage prepaid and addressed to you at your mailing address as described in subsection VI.S.1. (Notice of Amendments).

**VII.**
**DIGITAL DEPOSITS**

### A.   Funds Availability Policy Disclosure

(1)   **Your Ability to Withdraw Funds –** These provisions apply only to demand deposit checking Accounts where deposits are made via Digital Deposits. You agree that Electronic Images, as defined below, submitted via Digital Deposits (from either your personal computer or mobile device) are not subject to the funds availability requirements of the Federal Reserve Board's Regulation CC ("Regulation CC"). Our policy is generally to make funds from your Digital Deposits available to you on the first Business Day after the day we receive your deposit. Funds that are deposited using Digital Deposits will not be deemed "received" by us until we have received an Electronic Image that meets all of the requirements for deposits via Digital Deposits (including all requirements to create a Substitute Check) stated in this Agreement and in the Digital Deposits documentation. An Electronic Image may not be completely "received" even if successfully captured initially via scanner or mobile device until the Frost Bank internal Electronic Image verification process is complete, which can take from 24 – 48 hours. Consequently, even if an Electronic Image captured via scanner or mobile device is initially accepted for image quality, the Frost internal verification process may ultimately reject an Electronic Image as not meeting all of our requirements for Digital Deposits.  If Frost has made any funds available to you from an Electronic Image that is initially accepted but ultimately rejected through the Frost Bank Internal Image verification process, Bank will reject the Electronic Image and reverse the dollar amount of such rejected Electronic Image previously credited to your Account.  An Electronic Image rejected in this manner is not deemed "received" by

us. Once the funds are available, you can withdraw the funds in cash and we will use the funds to pay items and transactions drawn on your Account. For determining the availability of your deposits, every day is a Business Day, except Saturdays, Sundays, and federal holidays. If you make deposit via Digital Deposits on a day that is not a Business Day, we will consider such deposit made on the next Business Day we are open.

(2)   **Longer Delays May Apply –** In some cases, we will not make all of the funds that you deposit via Digital Deposits available to you on the first Business Day after the day of your deposit. Depending on the type of check that you deposit via Digital Deposits, funds may not be available until the second (2nd) Business Day after the day of your deposit. **The first $225 of your Digital Deposits, however, will be available on the first Business Day after the day of your deposit.** If we are not going to make all of the funds from your Digital Deposits available on the first Business Day after the day of your deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

•   We believe a check you deposit will not be paid.

•   **You deposit checks totaling more than $5,525 on any one (1) day.**

•   You redeposit a check that has been returned unpaid.

•   You have overdrawn your Account repeatedly in the last six (6) months.

•   There is an emergency, such as failure of computer or communications equipment.

The availability of funds you deposit via Digital Deposits may also be delayed for a variety of additional reasons as determined in Bank's sole discretion, including, but not limited to:

•   We believe a check you deposit via Digital Deposits is a duplicate image.

•   You deposit checks via Digital Deposits totaling more than any applicable daily dollar amount limit, monthly item limit or any other limitations on your Digital Deposits that Bank may impose.

•   We exercise our rights to investigate any unusual or suspicious Digital Deposits items as determined in Bank's sole discretion.

We will generally notify you if we delay your ability to withdraw funds for any of these or other reasons, and we will attempt to tell you when such funds will be available. If you will need the funds from a deposit via Digital Deposits, you should contact us to inquire when the funds will be available.

(3)   **Holds on Other Funds (Check Cashing) –** If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available to you if you had deposited the check.

(4)   **Holds on Other Funds (Other Accounts) –** If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another Account with us. The funds in the other Account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

**B.   Information Regarding Digital Deposits**

Should you desire to utilize Digital Deposits (Bank's remote deposit capture services), you must request such services from Bank either in person, via telephone or via the applicable Internet  banking services (e.g. consumer/small business internet banking or treasury management internet banking). Depending on the type of Digital Deposits you request, and depending on whether you are a Business or Personal Account Holder, you must have specialized equipment and access via the Internet to Bank's (or Bank's third-party vendor's) server-based Processing Software, as defined below, or access via Bank's (or Bank's third-party vendor's) mobile device Processing Software. Such equipment and Processing Software is required to enable you to generate Electronic Images of Original Checks that comply with applicable Standards, as defined below.

Bank retains the ability to either approve or deny your use of Digital Deposits in Bank's sole and absolute discretion. If Bank approves you to use the Digital Deposits, then by using such services, you agree to the provisions set forth in this Agreement, you agree to pay any fees that Bank may charge in conjunction with such Digital Deposits (as set forth in Bank's Fee Schedule) and you understand and agree that the meanings of the defined terms set forth in this Section are applicable both to this Agreement and the Documentation (as defined below) made available to you by us for use with the Digital Deposits. If any capitalized term defined below is used in the provisions of Regulation CC (Vol. 12 of the U.S. Code of Federal Regulations, part 229) promulgated to comply with the Check 21 Act, as it may be amended, substituted for, or recodified from time to time, then such term generally shall have the meaning assigned to it in Regulation CC. To the extent that any of the defined terms in this Agreement or in the Documentation use a term not defined herein but otherwise defined in Regulation CC, then such definition

also incorporates the meaning assigned to the applicable term as set forth in Regulation CC. To the extent that any term used by Bank in providing you the Digital Deposits is a term that is not used or defined in this Agreement or in the Documentation, you and Bank agree to such term commonly used with regard to remote deposit capture services shall have the meaning as defined in Regulation CC if such term is so defined.

All other capitalized terms used that are not otherwise defined in this Agreement or in the Documentation shall have the meaning given to such term in Article 3 or Article 4 of the UCC (as amended from time to time) effective in Texas as adopted in the Texas Business and Commerce Code. In addition, you acknowledge that the Electronic Image of the Original Check submitted to us shall be deemed an "item" within the meaning of Article 4 of the UCC as adopted in the Texas Business and Commerce Code.

• "Check 21" means Regulation CC, Subpart D, promulgated to implement the provisions of the Check Clearing for the 21st Century Act.

• "CTA" means the Check Clearing for the 21st Century Act, which became effective October 28, 2004.

• "Documentation" means the online help files or written instructions and materials made available or supplied by Bank that provide the description, methods of operation, and required procedures to engage in Digital Deposits activities.

• "Electronic Deposit" means a file that contains information regarding each Electronic Image(s) to be submitted by you to Bank that meets all of the requirements imposed from time to time by Bank as set forth in this Agreement and the Documentation.

• "Electronic Image" means a digital or electronic representation of an Original Check that is a Sufficient Copy and meets all of the Standards and is submitted by you to Bank for processing and collection as a Substitute Check.

• "Magnetic Ink Character Recognition Line" or "MICR Line" means the numbers, which may include the routing number, Account number, check number, check amount and other information, that are printed near the bottom of a check in magnetic ink in accordance with the Standards.

• "Original Check" means the first paper check issued to or endorsed in your favor with respect to a particular payment transaction.

• "Processing Software" means the software for personal computer or mobile device hosted by the Bank that administers the Digital Deposits process and captures Electronic Images for deposit.

• "Reconverting Bank" means: (1) the bank that creates a Substitute Check; or (2) with respect to a Substitute Check that was created by a person that is not a bank, the first bank that transfers, presents, or returns that Substitute Check or, in lieu thereof, the first paper or electronic representation of that Substitute Check.

• "Standards" means the applicable standards set forth in CTA, Check 21 or as promulgated by the American National Standards Institute ("ANSI") for image quality and transmission protocols, including, but not limited to, ANS X9.13, ANS 9.37 and ANS X9.100-140 (or any amendment or substitute for such standards as may be promulgated from time to time), whether such standard pertains to the MICR Line, the image quality of the Original Check, the placement of an image of the Original Check on the Substitute Check, or the manual or electronic transfer of a Sufficient Image Copy or other electronic representation of an Original Check or a Substitute Check, unless the Federal Reserve Board, by rule or order determines that a different standard is to apply.

• "Substitute Check" means a paper reproduction of an Original Check that: (1) contains an image of the front and back of the Original Check; (2) bears a MICR line that, except as provided under the applicable Standard, contains all the information appearing on the MICR line of the Original Check at the time that the Original Check was issued and any additional information that was encoded on the Original Check's MICR line before an image of the Original Check was captured; (3) conforms in paper stock, dimension, and otherwise with ANS X9.100-140 (unless the Federal Reserve Board by rule or order determines that a different standard applies); and (4) is suitable for automated processing in the same manner as the Original Check.

• "Sufficient Copy" means: (1) A sufficient copy is a copy of an Original Check that accurately represents all of the information on the front and back of the Original Check as of the time the Original Check was Truncated or is otherwise sufficient to determine whether or not a claim is valid. (2) A copy of an Original Check means any paper reproduction of an Original Check, including a paper printout of an electronic image of the Original Check, a photocopy of the Original Check, or a Substitute Check.

• "Sufficient Image Copy" means an Electronic Image of an Original Check or Substitute Check that is capable of printing a Sufficient Copy of such Original Check or Substitute Check.

• "Third Parties" means with regard to Business Account customers any party whom you hire, employ, or to whom you delegate your duties or responsibilities to administer Digital Deposits.

• "Truncate" means to remove an Original Check from the forward collection or return process and send to a recipient, in lieu

of such Original Check, a Substitute Check or, by agreement, information relating to the Original Check (including data taken from the MICR line of the Original Check or an Electronic Image of the Original Check), whether with or without the subsequent delivery of the Original Check.

### C. Customer Representations and Agreements; Indemnity

If you have met, in our sole discretion, the conditions we have established for use of Digital Deposits to make deposits via Electronic Images, we will provide Internet access to our computer network and accept for deposit to your Account(s) the Electronic Images of Original Checks for collection as allowed under this Agreement and the Documentation. However, you agree that you will not use Digital Deposits to submit any of the following:

• Checks or items payable to any person or entity other than you/your company.

• Checks or items drawn on foreign financial institutions or payable other than in United States currency.

• Checks or other items containing apparent alteration to any of the information on the front of the check or item, or which you know or suspect (or should know or suspect) are fraudulent or otherwise not authorized by the owner of the Account on which the check or item is drawn.

• Original Checks or other items previously converted to a Substitute Check.

• Checks or items that are Remotely Created Checks (as defined in Regulation CC).

• Checks or items dated more than six (6) months prior to the date of deposit.

• Checks or items prohibited by Bank's current Documentation relating to Digital Deposits, or checks or items which are otherwise not acceptable under the terms of your Account(s).
Such Electronic Images shall be deemed received by us for deposit based upon time of receipt as well as successful receipt of Electronic Images that are complete, usable, and adhere to the Standards. If any Electronic Image is not complete, is not usable, or does not adhere to the Standards, the Electronic Image may not be processed by us, in which event your deposit will be adjusted and notification provided.

You authorize us to accept transfers, checks and other items for deposit to your Account if they are made payable to, or to the order of, any one (1) or more of you, whether or not they are endorsed by you. You authorize us to supply missing endorsements, and you warrant that all endorsements are genuine. All Substitute Checks deposited via Frost Digital Deposits must be endorsed payable to the order of "Mobile Deposit Only, Frost Bank," followed by your signature and Account number. All endorsements must appear on the back of the check or other item within the first 1-1/2 inches from the left side of the item when looking at it from the front, except that for Substitute Checks, endorsements that appeared on the back of the Original Check must also appear on the back of the Substitute Check.

While we may accept non-conforming endorsements, you will be responsible for any loss incurred by us due to the delay in processing or returning the item for payment. We may (but are not required to) refuse to accept a check or other item for deposit to your Account if: (1) the check or other item is made payable to someone other than you or a joint Account Holder with you; and (2) the check or other item is not endorsed to you or a joint Account Holder with you. We will not be liable to you for refusing such a deposit.

You understand we will process only your Electronic Images that comply with the Standards and are Sufficient Image Copies, and we will use commercially reasonable efforts to present these Sufficient Image Copies for collection under the Check 21 framework. For information regarding our applicable depository cut-off times with regard to receipt of deposits via Digital Deposits, you should consult the Documentation made available to you for this purpose. The availability of funds for deposits via Digital Deposits is set forth in the Funds Availability Policy Disclosure section of this Agreement.

Should a drawee financial institution return an item to us unpaid, we will charge your respective Account for such returned item and may either: (1) return the item to you; or (2) re-present it to the drawee financial institution before returning it to you. Items may be returned as image exchange Items, rather than Substitute Checks. Should a drawee financial institution or other third party make a claim against us or seek recredit with respect to any Electronic Image, we may provisionally freeze or hold aside a like amount in your Account pending investigation and resolution of the claim.

You agree that you will submit to us for deposit to your Account only Electronic Images that are Sufficient Image Copies of Original Checks for deposit via Digital Deposits. No Electronic Image submitted by us to us represents an Original Check that has already been collected. You further agree that you will retain each Original Check that is Truncated through any Digital Deposits activity for a reasonable period of time, but in no event fewer than ten (10) Business Days from the date of deposit or such longer time as we may request from time to time with respect to any specific Original Check. You understand that in all cases, during the reasonable period of time described above, you are solely responsible for safeguarding all items you retain as required or permitted by Digital Deposits from destruction, alteration or theft. Such Original Checks must be securely stored (e.g., in a locked cabinet) to prevent unauthorized access to them until they are destroyed, as provided for below.

Also, you understand that in certain instances we may request from time to time the Original Check to respond to claims made by the drawer of the check. You agree to retrieve and produce for us the Original Check in question within seventy-two (72) hours of a written request by us. In the absence of retaining the relevant Original Check, you understand and agree you shall be solely responsible for the cost of any claim brought by the drawer of the check that for resolution would reasonably require access to relevant Original Check and shall indemnify us in accordance with the terms of the "Digital Deposits Indemnity" as set forth below. You understand and agree that no later than the thirty-first (31st) day following the date of deposit of an Original Check to us, you will destroy the Original Check in a commercially reasonable manner that renders it unusable or otherwise unreadable (e.g., shredding). If you fail to destroy the Original Check within thirty-one (31) calendar days following the date of deposit, you agree you are responsible for any losses arising from the loss, theft or misuse of any Original Check.

You understand and acknowledge that we are relying on the truth and veracity of all Electronic Images submitted for deposit via Digital Deposits by you to us, and you warrant that such Electronic Images accurately reflect Original Checks that are, or at the time of the creation of the Substitute Checks, were, in your possession.

If you deposit such an Electronic Image, you give us the same warranties and indemnities that we, as a reconverting bank, would give under applicable law or regulation. You understand and acknowledge that all of the warranties deemed given by a depositor of a check to a bank under the UCC as applicable from time to time in the State of Texas shall also apply to any Electronic Image of an Original Check, and also apply to any Substitute Check deposited by you (as described in Section IX.A.4. (Substitute Checks Deposited By You) of this Agreement) the same as if such Electronic Image or Substitute Check were a paper check within the meaning of the UCC as adopted in the Texas Business and Commerce Code. Accordingly, except to the extent that any warranties deemed given under the UCC as adopted in the Texas Business and Commerce Code are expressly superseded by the Check 21 Act or the Check 21 regulations, you understand that you are deemed to give us all the same warranties you would have given under the UCC as adopted in the Texas Business and Commerce Code for the deposit of an Original Check by transferring to us: (1) any Substitute Check; (2) an Image Replacement Document ("IRD") or other item purporting to be a Substitute Check; or (3) any Electronic Image that purports to contain a Sufficient Copy of an Original Check or a Substitute Check. Such warranties also include the following two (2) specific warranties regarding transfer and presentment:

• You warrant that the Electronic Image that we convert to a Substitute Check meets the requirements described in § 229.51(a)(1) – (2) of the Check 21 Regulation (found at 12 CFR § 229.51(a)(1) – (2)) for legal equivalence; and

• And your warranty given above is deemed given to us and any other person, company or bank to which we transfer, present or return the Substitute Check or a paper or electronic representation of the Substitute Check.

**WITH YOUR USE OF DIGITAL DEPOSITS, AND IN ADDITION TO ANYTHING ELSE SET FORTH IN THIS AGREEMENT, YOU ASSUME LIABILITY FOR, AND HEREBY AGREE TO INDEMNIFY, PROTECT AND HOLD HARMLESS BANK AND ITS AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, SUCCESSORS AND ASSIGNS ("BANK INDEMNITEES"), FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES AND EXPENSES, INCLUDING REASONABLE ATTORNEYS' FEES, OF ANY KIND OR NATURE ("DAMAGES") ARISING OUT OF THE USE OF, CONDITION (INCLUDING LATENT AND DEFECTS AND WHETHER OR NOT DISCOVERABLE BY YOU OR BANK), OPERATION, OWNERSHIP, SELECTION, DELIVERY, INSTALLATION OR LICENSING OF ANY ITEM OF PROCESSING SOFTWARE OR EQUIPMENT. HOWEVER, SUCH INDEMNIFICATION SHALL NOT EXTEND TO ANY DAMAGE OR LOSS DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF BANK.**

In addition, you agree to reimburse us for all claims, losses, costs and damages we may incur regarding any Electronic Image, Substitute Checks or IRD deposited by you. Furthermore, if you provide us with an Electronic Image of a Substitute Check for deposit into your Account instead of an Original Check, you agree to reimburse us for all claims, losses, costs and damages we incur because the Substitute Check resulting from the Electronic Image does not meet applicable Substitute Check Standards or causes duplicate payments. The amount of our loss which we may recover from you may be limited under the Check 21 Regulations.

### D.   Limitation on Liability

You agree that we shall not have any liability for any breach of any representation, warranty or covenant of this Agreement to the extent caused by: (1) the unavailability of the external connection services and other Internet network functions for Digital Deposits; (2) any use of the Digital Deposits by you in a manner not as set forth in this Agreement or the Documentation, or in a manner for which it was not designed, or in combination with systems, products or components not supplied or approved in writing by us; or (3) your use of Processing Software, equipment or other systems not approved or supplied by us. **YOU UNDERSTAND AND EXPRESSLY ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE OR ANTICIPATED PROFITS) OR FOR ANY INDIRECT LOSS THAT YOU MAY INCUR OR SUFFER IN CONNECTION YOUR USE OF DIGITAL DEPOSITS OR OUR TERMINATING YOUR DIGITAL DEPOSITS SERVICES IN ACCORDANCE WITH THIS AGREEMENT.**

### E.   Security Procedures

You agree to the Security Procedures used by the Bank in connection with the Digital Deposits. Such Security Procedures offered by the Bank are described herein and in Documentation applicable to such services. As part of the Security Procedures, Bank may employ various authentication technologies, including, but are not limited to, use of Online Banking Services user IDs, passwords and other AAI that Bank may require you to provide at Bank's sole discretion. Bank employs various security and authentication technologies to ensure that you, your employees, agents or Third Parties (if a Business Account Holder), are communicating directly with the Bank, and also to ensure that your computer or mobile device is communicating with a legitimate Bank computer. You are responsible for the establishment and maintenance of your internal procedures reasonably adapted to insure the confidentiality and security of Security Procedures. **YOU UNDERSTAND AND AGREE THAT YOU WILL BE RESPONSIBLE FOR MAINTAINING SECURITY AND CONTROL OVER ALL USER IDS AND PASSWORDS PROVIDED BY BANK, AND SHALL USE SECURITY FOR SUCH ITEMS COMPARABLE TO THE SECURITY AND CONTROL YOU WOULD USE FOR CASH, BUT IN NO EVENT LESS THAN REASONABLE SECURITY AND CONTROL IN THE CIRCUMSTANCES.**

If you, as well as your employees, agents or Third Parties (if a Business Account Holder), have reason to believe that any Security Procedure has or may have become known by unauthorized persons (whether or not employed by you), you shall immediately notify the Bank by telephone and confirm such oral notification in writing to the Bank within twenty-four (24) hours of the oral notification. The Bank will replace the Security Procedures in accordance with the Bank's standard security requirements related to Digital Deposits. To the maximum extent permitted by applicable law, you will be solely liable for all transactions initiated before the Bank has received such notification and has had a reasonable opportunity to act on such notification. The Bank reserves the right to change any or all of the Security Procedures offered and/or used at any time by giving oral or written notice to you. You agree that your use of the Digital Deposits after the Bank provides notice of such changes constitutes your acceptance of the new Security Procedures. You acknowledge that the purpose of Security Procedures is to authenticate the identity of the person initiating the action, not to detect errors in any transmission or content. The Bank is not agreeing to any Security Procedures or other procedure for the detection of errors. You represent that for Digital Deposits, you consider the Security Procedures to be commercially reasonable with respect to the size, type, and frequency of deposits you anticipate submitting.

With regard to your obtaining Digital Deposits services under this Agreement, you must comply with the personal computer, check scanner and mobile device hardware, software, and other requirements, as well as applicable Security Procedures, as set forth in this Agreement and as set forth in any Documentation or any supplemental information and/or instructions provided by the Bank. The Bank reserves the right as encryption technology develops to impose further reasonable requirements to maintain the appropriate level of security for Digital Deposits and transactions contemplated hereunder and you agree to abide by such requirements. Furthermore, you understand and acknowledge that if you do not implement and follow your own commercially reasonable hardware, software, physical access and physical storage Security Procedures regarding any of the data owned by you, which includes such data containing the sensitive personally identifiable information ("PII") of any individual, the security of your Digital Deposits and/or the data owned by you (including sensitive PII) may be compromised. You understand, acknowledge and agree that installation, maintenance and operation of your personal computer or mobile device (hardware and software) and related Security Procedures that you adopt and follow, including, but not limited to, data security protection, firewalls and anti-virus software, is your sole responsibility, and that you are solely responsible for securing, encrypting, protecting and otherwise safeguarding the data owned by you.

You understand, acknowledge and agree that the Bank is not responsible for any loss or damages resulting from any errors or failures of your personal computer, mobile device or data processing systems, including, but not limited to any personal computer or mobile device virus or malware attack (such as a keystroke logging program or similar malware), any attack by a person attempting or actually gaining unauthorized access to the data owned by you, or any Internet- related problems that may be associated with your access and use of our Digital Deposits.

For avoidance of doubt, you understand, acknowledge and agree that all data provided by you to Bank (including, but not limited to, Electronic Images or Substitute Checks retained on any processing equipment, Processing Software, or any other processing equipment or software (including your personal computer or mobile device) used by you in conjunction with Digital Deposits), and all data produced, compiled or otherwise provided by Bank to you, in any form or format, is your sole and exclusive property and copies thereof shall be provided to you at your request from time to time and at any time. Once such data owned by you is delivered by Bank to you, retrieved by you from Bank, or otherwise created as a by-product of a transaction between you and Bank and retained by you, such data owned by you is solely within your possession and control.

If you are a Business Account Holder, then in the event of any security breach incident involving any potential or actual unauthorized access or acquisition of data owned by you (e.g. computer hacking, virus attack, or theft or loss of any equipment containing data owned by you), it is your sole responsibility to determine whether you have the obligation, under applicable law, to notify potentially affected individuals whose sensitive PII may have been compromised by the security breach incident. You bear the sole responsibility for any and all costs of complying with required data breach notifications to individuals, credit bureaus and/or governmental entities as required by applicable law, and any and all costs for credit report monitoring of fraud monitoring associated with such security breach incident.

If, despite your efforts, you suffer any damage or loss as a result of your failure to comply with your data security obligations, and regardless of whether such damage or loss results from the activities of you, or if a Business Account Holder, your employees, agents, subcontractors or any unaffiliated Third Party, any such loss or damage shall be your sole responsibility.

If you are a Business Account Holder and intend to make use of a Third Party to administer your Digital Deposits activities, you agree to notify us in writing, in a form that is acceptable to Bank, of the name of any Third Party whom you hire, employ, or to whom you delegate your duties or responsibilities under the Agreement, before that Third Party initiates any transaction or performs any obligation authorized or required under this Agreement. You agree that you, as the Business Account Holder, shall be solely responsible for all acts of any such Third Party. By using Digital Deposits, you agree to provide information, including financial information, which we may, in our sole discretion, require from time to time regarding you or any Third Party which you hire, employ, or retain in any manner, to administer Digital Deposits or assume any of your duties under the Agreement. You understand and acknowledge that because of the risks involved, we may refuse, in our sole discretion, to provide Digital Deposits to you for any reason in our sole discretion, including if you or the Third Party retained by you does not meet our qualification criteria. Our acceptance of any Third Party retained by you based on our qualification criteria is not a representation or warranty by us regarding the fitness of the Third Party's capabilities or financial condition, nor is such acceptance by us an endorsement of any Third Party's ability to perform the Third-Party services for you. You agree that you will not allow any Third Party to use our Digital Deposits or to process Electronic Deposits to your Accounts without our prior written consent.

## F.   Termination

We may, in our sole discretion, terminate your Digital Deposits effective immediately if: (1) there is an occurrence of a material change in your Account activity or other risk analysis criteria as determined by us in our sole and absolute discretion; (2) we at any time determine that you (or your Third Party) does not meet our risk or other qualification requirements; (3) we discover any willful misconduct (including, but not limited to, types of fraudulent activity) on your part or any other party with respect to Electronic Images submitted for deposit by you using our Digital Deposits; (4) you are in default of any terms of this Agreement where such default gives us the right to terminate, immediately or otherwise, or close your Account; (5) you have not used Digital Deposits for a period of time deemed to constitute an inactive service by us (in our sole discretion); or (6) you are in default of any terms of the Agreement or any other agreement with us. In any of these events, you agree that our sole obligation shall be to provide notice of our termination of Digital Deposits to you, and that such notification will be reasonable if it is mailed to your statement mailing address immediately upon termination.

Either you or Bank may terminate Digital Deposits, with or without cause, upon thirty (30) calendar days' written notice to the other of its intent to do so, sent to you at your statement address and sent to us at the address provided herein. In the event of termination of Digital Deposits, your rights and responsibilities as well as ours, shall continue through any applicable settlement period, including your responsibility to pay us for Digital Deposits and with respect to transactions processed prior to the effective date of termination. If Digital Deposits are terminated by us, we may accelerate all amounts due and to become due, and you agree to promptly make full payment to us of all amounts due and amounts incurred by you through your use of our Digital Deposits.

**VIII.
DIGITAL WALLET SERVICE**

## A.   Generally

Generally, this section of the Agreement governs your election to use eligible debit or credit cards issued by Frost Bank (each, a "Payment Card") when you add, attempt to add, or keep a Payment Card in a digital wallet ("Digital Wallet" or "Wallet") on any mobile device that supports the Wallet (the "Digital Wallet Service"). You understand that your use of the Digital Wallet Service is subject to the terms and conditions of this Agreement, including this Section VIII. Proceeding with using the Digital Wallet Service constitutes your assent to and acceptance of the terms and conditions contained herein.

## B.   Relationship to Your Digital Wallet Provider

A Digital Wallet is a service offered exclusively by your Digital Wallet provider (e.g., Apple, Google, Samsung) using devices deemed eligible by your Digital Wallet provider. A Digital Wallet is a registered trademark of your Digital Wallet provider. Frost does not own, operate, or control any Digital Wallet and is not responsible for any service provided to you by your Digital Wallet provider or by any third party engaged by your Digital Wallet provider. Frost likewise is not responsible for any information or other services provided to you by your Digital Wallet provider or any other third parties associated with any Digital Wallet. Frost is not liable for any failure or performance of any Digital Wallet or any third party's products or services.

Your Digital Wallet provider, your wireless carrier, and other third-party websites or services integrated in any Digital Wallet have their own third-party agreements and you are subject to those third-party agreements when you give them your personal information, use their services, or visit their respective sites. **It is your responsibility to read and understand the third-party agreements before creating, activating, or using a Mobile Card (as that term is defined below) in a Digital Wallet.**

Frost is not responsible for, and does not provide, any support or assistance for any third-party hardware, software, or other products or services (including any Digital Wallet or your Supported Digital Wallet Device, as defined in Subsection E below). If

you have any questions or issues with a third-party product or service, including issues pertaining to the operation of your Supported Digital Wallet Device, please contact the appropriate third party in accordance with that third party's procedures for customer support and assistance. If you have any questions or issues pertaining to any Digital Wallet (other than questions or issues specific to the use of a Mobile Card), you should contact your Digital Wallet provider.

### C.   Relationships to Other Frost Agreements

Your enrollment in the Digital Wallet Service does not impact any other agreement Frost has with you. The terms of use for your Payment Card which were provided to you when your Payment Card was issued, and as amended from time to time, remain in full force and effect regardless of whether or not you use the Digital Wallet Service. Your cardholder agreements with Frost contain arbitration provisions which also apply to your use of your Payment Card through the Digital Wallet Service. For the avoidance of doubt, any transaction you make with your enrolled Frost Payment Card using the Digital Wallet Service will be considered the same as if you had presented your physical Payment Card in person to conduct the transaction and all applicable fees and interest will apply per the terms of your cardholder agreement with Frost.

### D.   Eligibility

Frost reserves the right to restrict the use of certain Payment Card types within the Digital Wallet Service. For the most current list of Payment Card types that are eligible for the Digital Wallet Service, please visit www.frostbank.com. In order for Frost to authorize your use of your Payment Card within the Digital Wallet Service, your Payment Card must be an eligible Payment Card type, your Payment Card and the underlying Account must be in good standing, and you must not be restricted from using the Digital Wallet Service based upon any limitations imposed by your Digital Wallet provider, your wireless service provider, and/or any third party associated with your Digital Wallet.

### E.   Device Eligibility

The Digital Wallet Service enables you to create virtual representations of your Payment Cards (collectively, "Mobile Cards") on an eligible Mobile Device to make: (1) contactless payments at merchants' contactless-enabled POS terminals or readers that accept contactless payments using a virtual representation of your Payment Card (in lieu of you presenting your physical Payment Card) and (2) in-app or other digital commerce payments at merchants participating in the Digital Wallet Service. You are required to have an eligible Mobile Device (a "Supported Digital Wallet Device") in order to use this service. Your Digital Wallet provider, in its sole discretion, determines which Mobile Devices are eligible to be used with the Digital Wallet. Mobile Devices which have been unlocked in an unauthorized fashion (jail-broken) or otherwise modified are not eligible to use the Digital Wallet Service.

You acknowledge that use of an ineligible Mobile Device with the Digital Wallet Service is expressly prohibited, constitutes a breach of these terms and is grounds for Frost to temporarily suspend, permanently terminate, or otherwise deny further access to your Payment Card in the Digital Wallet Service. Frost is not liable to you for the effects (third party or otherwise) of such termination or suspension.

### F.   Use of Your Mobile Cards

When you select a Payment Card to use with the Digital Wallet Service, certain Account information for the Payment Card will be transmitted to and stored according to the Digital Wallet and Payment Card network procedures and systems for the Supported Digital Wallet Device to facilitate your participation in the Digital Wallet Service. Once the Account information for a Payment Card has been stored in accordance with the Digital Wallet procedures, it is represented by a Mobile Card within the Digital Wallet function. By selecting a Mobile Card and placing your Supported Digital Wallet Device near a merchant's contactless-enabled POS terminal or reader or using that Mobile Card for an in-app purchase, you are authorizing the payment for the merchant's products or services with that Mobile Card through the Digital Wallet Service. To complete transactions above a certain dollar amount, merchants may require presentation of a physical companion card or a government-issued form of identification for inspection to authenticate your identity. Once created, a Mobile Card may work even if you do not have wireless service.

Your Digital Wallet may also allow you to view recent purchase transactions made by you with your Payment Card. Please note that some of the listed transactions may be pending charges, which are temporary and are subject to change (for instance, pre-authorizations at restaurants and hotels). Your Digital Wallet may provide you with the option and ability to turn off this purchase transaction reporting for each Mobile Card. For additional information, you can view transaction details by logging into Frost Online Banking Services or you can call the number on the back of your Payment Card to speak to a Frost banker.

Purchases or other transactions you make with any of your Payment Cards are governed by the card member agreement for the Payment Card you used to create your Mobile Card. If a problem arises with the product or service you purchased through use of the Mobile Card, you first should try to resolve the problem directly with the merchant, but you may also have rights under your card member agreement or otherwise under applicable law.

### G.  Fees

Frost does not currently charge any fees for using the Digital Wallet Service. You should read the rest of this Agreement and applicable Schedules for any applicable fees, interests, or other charges associated with your Account. You understand that your third-party agreements may, however, contemplate fees, limitations, and restrictions which might affect your use of any of your Mobile Card(s) (such as data usage or text messaging charges imposed on you by your wireless carrier). You agree you are solely responsible for all such fees and agree to comply with such limitations and restrictions.

Frost reserves the right to institute charges for account access or for additional transactions or features in the future, but only after written and/or electronic notification to you in accordance with applicable law.

### H.  Suspension; Cancellation

Frost reserves the right, for any reason, to discontinue offering or supporting any Mobile Card and/or the Digital Wallet Service. Except as otherwise required by applicable law, Frost may block, restrict, suspend or terminate your use of any Mobile Card at any time without notice and for any reason, including if you violate the terms of this Agreement or any of your card member agreements, if Frost suspects fraudulent activity, or as a result of the cancellation or suspension of your Payment Card account. You agree that Frost will not be liable to you or any third party for any block, suspension, cancellation or termination of your use of any Mobile Card.

Frost may disqualify a Mobile Card or discontinue providing any services to any individual suspected of violating the terms of this Agreement or the third-party agreements related to your Digital Wallet or the Digital Wallet Service in its sole and absolute discretion. Frost also cautions you that ANY ATTEMPT BY AN INDIVIDUAL OR ENTITY TO DELIBERATELY INTERFERE, INTERRUPT, MODIFY, AUDIT, ASSESS, RE-ENGINEER, OR DAMAGE ANY ASPECT OF A MOBILE CARD OR THE DIGITAL WALLET SERVICE OR UNDERMINE THE LEGITIMATE OPERATION OF A MOBILE CARD OR THE DIGITAL WALLET SERVICE IS A VIOLATION OF CRIMINAL AND CIVIL LAWS AND FROST RESERVES THE RIGHT TO SEEK DAMAGES AND COSTS (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) FROM ANY INDIVIDUAL OR ENTITY RESPONSIBLE FOR SUCH ATTEMPT TO THE FULLEST EXTENT PERMITTED BY LAW.

You may remove one (1) or more of your Mobile Cards from your Digital Wallet at any time by following the instructions in your Digital Wallet or by calling the number on the back of your Payment Card.

### I.  Electronic Contact

In addition to the communications you expressly consent to receive under Section IV.C. (Consent to Autodialed and Prerecorded Phone Calls and Text Messages) of this Agreement, you expressly consent to receive phone calls, text messages, push notifications, and emails related to the Digital Wallet Service from Frost and any Frost third-party service provider at any phone number (including any mobile phone number) and email address you have provided to Frost or any Frost third-party service provider. Such phone calls and text messages may include auto-dialed phone calls and text messages, prerecorded phones calls and text messages, or both. If you change any phone number you have provided to Frost or any Frost third-party service provider, for any reason, you agree to immediately notify Frost to ensure that the above communications are not interrupted or inadvertently delivered to another recipient who may be reassigned your prior phone number. You may change your phone number by following the steps outlined at www.frostbank.com.

### J.  Data Privacy

When creating your Mobile Card, Frost collects certain information from your Digital Wallet provider to verify your identity, enable you to use a Mobile Card, and facilitate your participation in the Digital Wallet Service. You authorize Frost to collect, use and share your information in accordance with the applicable Frost privacy policies, as they may be amended from time to time. To facilitate your participation, you acknowledge and agree that Frost may make certain Account information relating to each Payment Card you have selected to use with the Digital Wallet Service available for display, including your most recent transaction data, but not your full Payment Card account number. You may have the ability to decline to have the transaction data made available for display and still use the Digital Wallet Service, but you must follow the instructions for doing so in your Digital Wallet. You agree that Frost may also collect and use technical data and related information, including, but not limited to, technical information about your Supported Digital Wallet Device, gathered periodically to facilitate the updates to Frost's services. Frost may use this information, as long as it is in a form that does not personally identify you, to improve Frost's products or to provide services or technologies to you.

You understand and acknowledge that third parties, such as your Digital Wallet provider, or card network associations such as Visa, will have access to certain details regarding eligible Payment Card transactions made using the Digital Wallet Service. You understand that information that is provided to or held by your Digital Wallet provider or other third parties in relation to any Digital Wallet is outside the control of Frost. As stated earlier, Frost is not responsible for the Digital Wallet or any other services offered by your wireless carrier or any third party. Accordingly, any information you provide to your Digital Wallet provider or

another third party through the Digital Wallet Service, or that is collected or accessed by your Digital Wallet provider in the course of your use of a Mobile Card or the Digital Wallet Service, is subject to third-party agreements, and is not governed by Frost's Customer Privacy Statement or this Agreement.

### K.   Changes to Digital Wallet Service Terms

Frost reserves the right to revise these Digital Wallet Service terms at any time, and you are deemed to be aware of and bound by any changes to these terms by your continued access to or use of any Mobile Card and/or the Digital Wallet Service. If you do not accept any revisions made to these terms, your sole and exclusive remedy is to cancel your use of and delete all Mobile Card(s) and to cease using the Digital Wallet Service.

### L.   Disclaimer of Warranties

IN ADDITION TO ANY OTHER DISCLAIMERS OF WARRANTIES CONTAINED ELSEWHERE IN THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE USE OF ANY MOBILE CARD AND THE DIGITAL WALLET SERVICE IS AT YOUR SOLE RISK. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY MOBILE CARD IS PROVIDED TO YOU "AS IS" AND "AS AVAILABLE," WITH ALL DEFECTS THAT MAY EXIST FROM TIME TO TIME AND WITHOUT WARRANTY OF ANY KIND, AND FROST, ON BEHALF OF ITSELF AND ITS SUPPLIERS, HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO ANY MOBILE CARD, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS. FROST, ON BEHALF OF ITSELF AND FROST'S SUPPLIERS, ALSO DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF ANY MOBILE CARD OR THE DIGITAL WALLET SERVICE, OR THAT THE FUNCTIONS CONTAINED IN, OR SERVICES PERFORMED OR PROVIDED BY, A MOBILE CARD OR THE DIGITAL WALLET SERVICE WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OR AVAILABILITY OF A MOBILE CARD OR THE DIGITAL WALLET SERVICE WILL BE UNINTERRUPTED OR ERROR- FREE, OR THAT DEFECTS IN A MOBILE CARD OR THE DIGITAL WALLET SERVICE WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY FROST, ANY OF ITS AUTHORIZED REPRESENTATIVES OR ANY THIRD PARTY SHALL CREATE ANY WARRANTY.

ACCESS, USE AND MAINTENANCE OF A MOBILE CARD DEPEND ON THE DIGITAL WALLET AND THE NETWORKS OF WIRELESS CARRIERS. FROST DOES NOT OPERATE THE DIGITAL WALLET OR SUCH NETWORKS AND HAS NO CONTROL OVER THEIR OPERATIONS. FROST WILL NOT BE LIABLE TO YOU FOR ANY CIRCUMSTANCES THAT INTERRUPT, PREVENT OR OTHERWISE AFFECT THE FUNCTIONING OF ANY MOBILE CARD, SUCH AS UNAVAILABILITY OF THE DIGITAL WALLET OR YOUR WIRELESS SERVICE, COMMUNICATIONS, NETWORK DELAYS, LIMITATIONS ON WIRELESS COVERAGE, SYSTEM OUTAGES, OR INTERRUPTION OF A WIRELESS CONNECTION. FROST DISCLAIMS ANY RESPONSIBILITY FOR THE DIGITAL WALLET OR ANY WIRELESS SERVICE USED TO ACCESS, USE OR MAINTAIN A MOBILE CARD OR ACCESS THE DIGITAL WALLET SERVICE.

USE OF A MOBILE CARD INVOLVES THE ELECTRONIC TRANSMISSION OF PERSONAL INFORMATION THROUGH THIRD-PARTY CONNECTIONS. BECAUSE FROST DOES NOT OPERATE OR CONTROL THESE CONNECTIONS, FROST CANNOT GUARANTEE THE PRIVACY OR SECURITY OF THESE DATA TRANSMISSIONS. ADDITIONALLY, YOUR SUPPORTED DIGITAL WALLET DEVICE'S BROWSER IS GENERALLY PRE-CONFIGURED BY YOUR WIRELESS CARRIER. YOU SHOULD CHECK WITH YOUR DIGITAL WALLET PROVIDER AND YOUR WIRELESS CARRIER FOR INFORMATION ABOUT THEIR PRIVACY AND SECURITY PRACTICES. FOR PERSONAL OR CONFIDENTIAL INFORMATION SENT TO OR FROM FROST OVER THE INTERNET FROM YOUR SUPPORTED DIGITAL WALLET DEVICE, FROST RESERVES THE RIGHT TO LIMIT SUCH CONNECTIONS TO "SECURE SESSIONS" THAT HAVE BEEN ESTABLISHED USING TRANSPORTATION LAYER SECURITY OR OTHER SECURITY STANDARDS FROST SELECTS.

FROST MAKES NO GUARANTEES ABOUT THE INFORMATION SHOWN IN THE DIGITAL WALLET SERVICE SOFTWARE OR HARDWARE IT CONTAINS AND MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES REGARDING THE SAME.

This "Disclaimer of Warranties" section shall survive any termination of this Agreement for any reason.

### M.   License for Any Mobile Card

A MOBILE CARD AND THE DIGITAL WALLET SERVICE ARE LICENSED, NOT SOLD, TO YOU FOR USE ONLY UNDER THE TERMS AND CONDITIONS OF THESE TERMS OF USE. FROST RESERVES ALL RIGHTS NOT EXPRESSLY GRANTED TO YOU.

You are granted a non-exclusive, non-sublicensable, non-transferable, personal, limited license to install and use the Mobile Card and the Digital Wallet Service on your Supported Digital Wallet Device solely in accordance with these Digital Wallet Service terms and this Agreement. The license is limited to use on any Supported Digital Wallet Device that you own or control

and as permitted by any applicable third-party agreements. Such license does not allow you to use the Mobile Card(s) on any device that you do not own or control (or for which you do not have authorization to install or run the Digital Wallet Service or the Mobile Card, such as where prohibited by applicable security policies in the case of corporate users), and you may not distribute or make any Mobile Card or the Digital Wallet Service available over a network where it could be used by multiple devices at the same time.

Certain software that Frost uses to provide the Mobile Card(s) has been licensed from third parties (each a "Third-Party Licensor") that are not affiliated with Frost. This limited right to use such software is revocable at the discretion of Frost. Frost and its Third-Party Licensors retain all right, title and interest in and to the software used by Frost to provide the Mobile Card(s), Digital Wallet Service, and any modifications and updates thereto. You agree that you will not use any third- party materials associated with the Mobile Card(s) or the Digital Wallet Service in a manner that would infringe or violate the rights of any party, and that Frost is not in any way responsible for any such use by you. All third-party intellectual property marks, including the logos of merchants, are the property of their respective owners.

You may not rent, lease, lend, sell, redistribute or sublicense the Mobile Card or the Digital Wallet Service. You may not copy, decompile, reverse engineer, disassemble, attempt to derive the source code of, modify, or create derivative works of any Mobile Card or the Digital Wallet Service, any updates, or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by the licensing terms governing the use of any open sourced components included with a Mobile Card or the Digital Wallet Service). Any attempt to do so is a violation of the rights of Frost and its Third-Party Licensors.  If you breach this restriction, you may be subject to a civil lawsuit, prosecution and damages. The terms of the license will govern any upgrades provided by Frost that replace or supplement any Mobile Card, unless such upgrade is accompanied by a separate agreement in which case the terms of that agreement will govern.

You agree that a Mobile Card may be automatically updated or upgraded without notice to you. At any time, at Frost's sole discretion and without prior notice, Frost may expand, reduce or suspend the type and/or dollar amounts of transactions allowed using a Mobile Card or change the enrollment process.

The license granted hereunder is effective until terminated by you or Frost. Your rights will terminate automatically without notice from Frost if you fail to comply with these terms or if Frost terminates the use of your Mobile Card or the Digital Wallet Service. Upon termination of the license, you must cease all use of the Digital Wallet Service and Mobile Card and delete all Mobile Card(s) from the Digital Wallet Service.

## N.   Indemnification

In addition to the indemnification provisions contained elsewhere in this Agreement, you shall indemnify and hold Frost, its licensors (including any Third-Party Licensors), sponsors, agencies and its parents, subsidiaries, affiliates, officers and employees, harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of: (1) your use of any Mobile Card and the Digital Wallet Service; or (2) any breach of the terms and conditions set forth in the terms of this Agreement by you or other users of the Digital Wallet Service using your Mobile Card or credentials. You must use your best efforts to cooperate with Frost in the prosecution or defense of any such claim. Frost has the right to employ counsel of Frost's choice to defend and control of any such matter subject to indemnification by you. You have the right, at your own expense, to employ separate counsel to participate in such matter on a non-controlling basis. You agree that this paragraph shall survive the termination of this Agreement for any reason.

## O.   Limitation of Liability

IN ADDITION TO LIMITATION OF LIABILITY PROVISIONS CONTAINED ELSEWHERE IN THIS AGREEMENT, AND EXCEPT AS OTHERWISE PROVIDED BY LAW, IN NO EVENT SHALL FROST, ITS DIRECT OR INDIRECT SUBSIDIARIES, AFFILIATES, AGENTS, EMPLOYEES OR REPRESENTATIVES BE LIABLE FOR DEATH, PERSONAL INJURY, PROPERTY DAMAGE, OR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF OR DAMAGE TO DATA, BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL OR FINANCIAL DAMAGES, LOST REVENUES, OR OTHER LOSSES OF ANY KIND, ARISING OUT OF THESE TERMS OR IN ANY WAY RELATED TO YOUR USE OR INABILITY TO USE ANY MOBILE CARD, HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY (CONTRACT, TORT OR OTHERWISE) AND EVEN IF FROST HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATIONS WILL APPLY EVEN IF THE ABOVE STATED REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THIS PARAGRAPH SHALL SURVIVE TERMINATION OF THIS AGREEMENT FOR ANY REASON.

## P.   Your Responsibilities

### (1)   Payment Card Enrollment in Your Digital Wallet

If you want to add a Payment Card to your Digital Wallet, you agree to follow the procedures adopted by your Digital Wallet provider and any further procedures Frost adopts. Frost may not add a Payment Card to the Wallet if Frost cannot authenticate the Payment Card or if Frost otherwise suspects that there may be fraud associated with the Payment Card. The Wallet allows

you to make purchases using an added Payment Card wherever the Wallet is accepted. The Wallet may not be accepted at all places where your Payment Card is accepted.

**(2)   Report Lost or Stolen Devices or Payment Cards**

If you enroll in the Digital Wallet Service and your Supported Digital Wallet Device is lost or stolen, or you have reason to believe that your Supported Digital Wallet Device has been compromised, including that of your fingerprint reader, PIN, or other security device, you agree to contact Frost immediately so that Frost can take action to disable your Payment Card for use within the Digital Wallet Service. Note, however, that you are also responsible for notifying your Digital Wallet provider if your Supported Digital Wallet Device is lost or stolen. Frost is not responsible for and is unable to disable your Supported Digital Wallet Device or Digital Wallet; Frost can only disable your Payment Card.

Given that your Supported Digital Wallet Device can be used like a Payment Card to make purchases, you must notify Frost in the event your Supported Digital Wallet Device is lost or stolen with the same urgency as if your actual Payment Card is lost or stolen. If you fail to notify Frost, you may be liable for all or a portion of the losses associated with unauthorized use of your Payment Card whether or not that use was through the Digital Wallet Service. If you get a new Supported Digital Wallet Device, you must delete all your Mobile Cards and other personal information from your prior Supported Digital Wallet Device.

You must cooperate with Frost in any investigation and use any fraud prevention or other related measures Frost prescribes.

**(3)   Security**

In addition to the Security Procedures described in this Agreement, you are solely responsible for maintaining the confidentiality of your Digital Wallet provider User ID, your Digital Wallet provider passwords, your device passwords, and any other means that you may use to securely access the Digital Wallet Service on your Supported Digital Wallet Device. If you share these credentials with anyone, that person may be able to use your Wallet to make purchases or obtain access to your personal and payment information available through the Digital Wallet Service. You agree to safeguard your Supported Digital Wallet Device at all times and not leave it unattended.

Your Digital Wallet and your Supported Digital Wallet Device may contemplate certain security features and procedures to protect against unauthorized use of any of your Mobile Card(s). These features and procedures are the sole responsibility of your Digital Wallet provider. You agree not to disable any of these security features and to use these security features and procedures to safeguard all your Mobile Cards.

**(4)   Account Ownership/Accurate Information**

You represent that you are the legal owner of the Account(s) and other financial information which may be accessed via the Digital Wallet Service. You represent and agree that all information you provide to Frost in connection with the Digital Wallet Service is accurate, current, and complete and that you have the right to provide such information to Frost for the purpose of using the Digital Wallet Service. You agree not to misrepresent your identity or your Account information. You agree to keep your Account information confidential, up to date, and accurate. You represent that you are an authorized user of the Mobile Device you will use to access the Digital Wallet Service.

IX.
**SUBSTITUTE CHECK POLICY DISCLOSURE**

Under the Check 21 Regulations, any check you write or deposit need no longer be returned for payment by the bank of the person to whom you wrote the check. Such other bank may instead send us a Substitute Check or, in some cases, an Electronic Image by which we can create a Substitute Check. A Substitute Check that you receive is the legal equivalent of an Original Check for all purposes.

Check 21 requires that we provide you with the following disclosure entitled "Substitute Checks and Your Rights." If you have any questions about this, — or anything else relating to Check 21, — please give us a call at 1-800-513-7678.

**A.   Substitute Checks and Your Rights**

**(1)   What is a Substitute Check –** To make check processing faster, federal law permits banks to replace Original Checks with "Substitute Checks." These checks are similar in size to Original Checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the Original Check." You may use a Substitute Check as proof of payment just like the Original Check.

Some or all of the checks issued by you for payment, or other checks deposited by you, that you receive from us may be Substitute Checks. This notice describes the rights you have when you receive Substitute Checks from us. The rights in this notice do not apply to Original Checks or to electronic funds debits from your Account. However, you have rights under other law with respect to those transactions as described elsewhere in this Agreement.

**(2)   What are Your Rights Regarding Substitute Checks –** In certain cases, federal law provides a special procedure that

allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account (for example, if you think that we withdrew the wrong amount from your Account or that we withdrew money from your Account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a result of the withdrawal (for example, non-sufficient funds fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. You also are entitled to interest on the amount of your refund if your Account is an interest-bearing Account. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under law.

If you use this procedure with respect to a Personal Account, you may receive up to $2,500 of your refund (plus interest if your Account earns interest) within ten (10) Business Days after we receive your claim and the remainder of your refund (plus interest if your Account earns interest) not later than forty-five (45) calendar days after we receive your claim. We may reverse the refund (including interest on the refund) if we later are able to demonstrate that the Substitute Check was correctly posted to your Account.

(3)  **How Do You Make a Claim for a Refund –** If you believe that you have suffered a loss relating to a Substitute Check you received and that was posted to your Account, please promptly contact us at 1-800-513-7678 or write to us at Frost Bank, Customer Service, P.O. Box 1600, San Antonio, TX 78296. You must contact us within forty (40) calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include:

• A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);

• An estimate of the amount of your loss;

• An explanation of why the Substitute Check you received is insufficient to confirm that you suffered a loss; and

• A copy of the Substitute Check or the following information to help us identify the Substitute Check: the check number, the name of the person to whom you wrote the check, and the approximate amount of the check.

You understand that even if you have asked for your original paper checks to be returned to you with your statement, those paper checks may not all be your Original Checks. Some or all of these original paper checks may be replaced with Substitute Checks.

(4)  **Substitute Checks Deposited by You –** Should you receive a valid Substitute Check from someone else that has not yet been collected, you may deposit that Substitute Check in the same manner as you would deposit an Original Check you received. Creating a valid Substitute Check takes specialized equipment and adherence to precise specifications. Accordingly, you agree not to attempt to change any Original Check you write or receive into a Substitute Check unless we, in our discretion, have first entered into a separate written agreement with you to permit you to create Substitute Checks that we will honor when deposited into your Account. If you do not have a separate written agreement with us granting you the ability to create Substitute Checks, then you can only deposit Substitute Checks or any IRD that purports to be a Substitute Check if such Substitute Checks have already been endorsed by a bank.

## X.
## ELECTRONIC BANKING SERVICES

### A.  Electronic Funds Transfers Generally

"Electronic funds transfers" refers to the following activities with respect to a Personal Account: ATM and Debit Card transactions (including POS transactions), direct deposits of payroll checks or government checks, preauthorized withdrawals, other direct deposits, use of our 24-hour automated phone system or use of Frost Online Banking Services. These electronic funds transfers are generally governed by regulations issued by the Federal Reserve Board of Governors. Similar electronic funds transactions made with respect to Business Accounts are governed by the Texas Business and Commerce Code and any applicable federal law, rule, or regulation. You understand that all electronic funds transfers must originate from an Account on which you are an Account Holder. We reserve the right to refuse the acceptance of any particular transfer for any reason. If you have overdraft protection with us, you authorize us to make transfers and/or advances to your Account(s) pursuant to the Frost Bank Overdraft Protection Agreement if the balance in your Account is at any time insufficient to support any transfers you authorize.

### B.  Required Disclosures Under Electronic Funds Transfer Act and the Consumer Financial Protection Bureau's Regulation E

(1)    **ATM and Debit Card Transfers and Limitations –**

(i)    **Account Access –** you may use your card and PIN to:

•  Withdraw money from your checking or savings Account;

•  Make deposits to your checking or savings Account;

•  Transfer funds between your checking and savings Accounts;

•  Pay for purchases at places that have agreed to accept the card; and

•  Obtain balance information for your checking or savings Account.
However, some of these services may not be available at all POS or ATM terminals.

(ii)    **Limitations on Consumer Accounts**

•  You may withdraw up to $1,000 per card per day at ATM terminals (separate ATM machine withdrawal limits may apply).

•  You may purchase up to $4,500 per Account per day at Visa merchants, POS terminals, and by cash advance.

(iii)    **Limitations on Business Accounts**

•  You may withdraw up to $1,000 per card per day at ATM terminals (separate ATM machine withdrawal limits may apply).

•  You may purchase up to $4,500 per card per day at Visa merchants, POS terminals, and by cash advance.

For further information regarding the use of your Debit Card, please refer to the applicable Frost Bank Card Agreement and Disclosure applicable to those services.

(iv)    **ATM Stand-In Mode Issues**

•  During scheduled system maintenance or unscheduled downtimes, Frost operated ATMs may go into "Stand-In Mode."

•  During this maintenance window, you may have limited transaction capabilities. If you conduct a debit card transaction during Stand-In Mode, balance information may not be accurate due to system maintenance.

•  Because of a lack of real-time balance information when in Stand-In Mode, we encourage you to use caution when conducting transactions that may move your Account balance into a negative or overdrawn status, which may cause you to incur an associated overdraft fee.

(v)    **24 Hour Automated Phone Line**

(a)    **Account Access –** you may use your PIN or code to:

•  Transfer funds between your checking and savings Accounts; and

•  Obtain balance information for your checking or savings Account.

(b)    **Limitations –** there are no limitations on the number or dollar amount of transfers you may make per day.

(2)    **General Information –** These provisions apply to electronic fund transfers involving Personal Accounts. You understand and acknowledge these provisions do not apply to any Business Account. These provisions generally apply to electronic funds transfers, deposits, cash withdrawals and purchases made with any Frost Bank Debit Card or similar card, PIN, Frost Bank User ID, or other device or code which accesses a consumer Account, and to direct deposits and some types of preauthorized and telephone-initiated transfers involving consumer Accounts (including a transaction you may initiate by check but which a merchant converts into an electronic funds transfer). These provisions do NOT apply to: (i) debits which the Bank is authorized to make from your Account(s) for service charges and other fees; (ii) preauthorized automatic transfers you have instructed Bank to make to another of your Account(s); (iii) payment of any loan that you have with us; and (iv) to certain other types of consumer transactions which are excluded from Regulation E.

(3)    **Your Liability for Unauthorized Transfers –** Tell us AT ONCE if you believe your Frost Bank Debit Card or similar card, or your Frost Bank User ID, PIN or other device or code which accesses your Account has been lost, stolen or otherwise learned or acquired by an unauthorized person, or if you believe that an electronic funds transfer has been made without your permission using information from your check or otherwise. The best way to minimize your loss is to call us immediately. The unauthorized use of your card or PIN could cause you to lose all of your money in your Accounts, plus any amount available under your overdraft protection if you do not notify us in a timely manner. Also, if your Account statement shows transfers that you did not make, including those made by card, code or other means, tell us at once.

You will have no liability for unauthorized transactions if you notify us within sixty (60) calendar days after the statement showing the transaction has been mailed to you. If you do not tell us within sixty (60) calendar days after the statement was mailed to you, you may not get back any money you lost after the sixty (60) calendar days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a valid reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

For transactions processed through the Visa system (for example, use of your personal Debit Card when no PIN is used), liability limits differ from those set forth above. For transactions processed through the Visa system, you will have no liability for unauthorized transactions in accordance with the network's respective policy regarding "zero liability" if you promptly report the unauthorized transactions to us. For Visa transactions, we may impose greater liability, to the extent allowed by law, if we reasonably determine that you were negligent or fraudulent in the handling of your Account or your personal Debit Card. We may reasonably determine that you were negligent or that you failed to exercise reasonable care, for instance, if you do not promptly report one (1) or more unauthorized transactions to us.

(4)   **How to Notify Us –** The telephone number and relevant address for notification are as follows:

Telephone:   (800) 513-7678

In writing:
Frost Bank
Telephone Customer Service
P.O. Box 1600, San Antonio, TX 78296

E-mail:   webhelp@frostbank.com

Frost Online Banking users can also report a lost or stolen card online at www.frostbank.com by going to the Frost Online Banking homepage, clicking "Account Services" and selecting "Report a Lost or Stolen Card" under "Card Management."

(5)   **Error Resolution Procedures –** In case of errors or questions about your electronic funds transfers, either call or write to us using our contact information as listed above. Call or write as soon as you can if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than sixty (60) calendar days after we sent you the FIRST statement on which the problem or error appeared. You must provide us with the following information:

(i)   Tell us your name and Account number.

(ii)   Describe the error or the transfer you are unsure about and explain as clearly as you can why you believe it is an error or why you need more information.

(iii)   Tell us the dollar amount of the suspected error.

If you tell us orally or electronically, we may require that you send us your complaint or question in writing within ten (10) Business Days after you initially inform us. We will determine whether an error occurred within ten (10) Business Days after we hear from you and will correct any error promptly. However, if we need more time, we may take up to forty-five (45) calendar days to investigate your complaint or question. If we decide to do this, we will credit your Account within ten (10) Business Days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) Business Days of our request, we may not credit your Account.

For errors involving a transfer to or from an Account within thirty (30) calendar days after the first deposit to that Account (herein referred to as a "New Account"), or for errors involving POS or foreign-initiated transactions, we may take up to ninety (90) calendar days to investigate your complaint or question. For New Accounts, we may take up to twenty (20) Business Days to credit your Account for the amount you think is in error.

If a notice of error involves unauthorized use of your card for a transaction processed through the Visa system (for example, use of your personal Debit Card when no PIN is used), we will provide provisional credit within five (5) Business Days after you notify us instead of within the usual ten (10) or twenty (20) Business Days. We may in our sole discretion withhold providing this accelerated provisional credit, to the extent allowed under applicable law, if we believe that the circumstances or Account history warrants the delay.

We will tell you the results within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

(6)   **Online Banking, Mobile Banking, and Bill Payment Services –** Account access and limitations on transfers associated with our Online Banking Services (which include optional Mobile Banking Services) are described in our Frost Online Banking Agreement and Disclosure. We may amend the Frost Online Banking Agreement and Disclosure from time to time, as set forth therein, and such amendments may not occur at the same time we amend this Agreement.

(7)    **Electronic Check Conversion –** You may authorize a merchant or other payee to make payment via a one-time electronic funds transfer from your checking Account using information from your check to:

- Pay for purchases

- Pay bills

(8)    **Represented Check Transaction –** You may authorize a merchant or other payee to electronically collect a fee associated with the re-presentment of a check that is returned due to insufficient or unavailable funds. The resulting fee transaction if debited as an electronic funds transfer from a consumer Account is covered by the Electronic Funds Transfer Act and the Electronic Funds Transfer disclosure contained in this Section X.B. When a merchant re-presents a check electronically, that transaction is not covered by the Electronic Funds Transfer Act or this Electronic Funds Transfer disclosure. A description of the transaction will appear on your statement.

(9)    **Fees –**

(i)    **ATM and Debit Card Fees –** For information regarding our fees applicable to the use of your card, see our current Schedule.

(ii)    **ATM Fees Charged by Others –** If you use an ATM that is not operated by us, you may also be charged a fee by the ATM operator and/or by any automated transfer network used, and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer.

(10)    **Stop Payments on ATM, POS, or Debit Card Transactions –**

You may not place a stop payment order on any ATM, POS or Debit Card transaction. If you provided your card number for a recurring transfer you wish to stop, you must contact us by telephone or at the branch and give us the exact card number. We will close the card, and you can replace it upon request.

(11)    **Confidentiality –**

You authorize us to disclose information to third parties or our affiliates about you, your Account(s), or transfers you make:

- Where it is necessary for completing transfers;

- In order to verify the existence and condition of your Account(s) for a third party, such as a credit bureau or merchant;

- In order to comply with government agency or court orders, or other applicable law;

- If you give us your written permission; and

- In accordance with our privacy statement as set forth in our Customer Privacy Statement.
Please see our Customer Privacy Statement for your choices about information sharing.

(12)    **Documentation of Transfers –**

(i)    **ATM Transactions –** You can get a receipt at the time you make any transfer to or from your Account using one of our ATMs.

(ii)    **Preauthorized Credits –** If you have arranged to have direct deposits made to your Account at least once every sixty (60) calendar days from the same person or company, you can call us at 1-800-513-7678 to find out whether or not the deposit has been made.

(iii)    **Periodic Statements –** You will get a monthly Account statement from us, unless there are no transfers in a particular month. In any case, you will get an Account statement at least quarterly.

(13)    **Preauthorized Payments –**

(i)    **Stop Payment Rights –** If you have told us in advance to make regular electronic funds transfers or ACH transactions out of your Account(s), you can stop any of these payments. Here's how: call us at 1-800-513-7678, or write to us at Frost Bank, Attn: Stop Payment Clerk, P.O. Box 1600, San Antonio, Texas, 78296 in time for us to receive your request three (3) Business Days before the transfer is scheduled to be made. If the request is made less than three (3) Business Days in advance, we must have a reasonable opportunity to act upon the stop payment order. If you call us, we may also require you to put your request in writing and mail or otherwise transmit it to us within fourteen (14) calendar days after you call.  If we require written confirmation and do not receive it, we may remove the stop payment order after fourteen (14) calendar days from the date we requested such written confirmation, and we may honor subsequent ACH transaction debits to the Account.  We may charge you a fee for each stop payment order you give us in accordance with our fee schedule.

You must tell us the exact amount and payee name of the payment you have stopped, as well as any other identifying

information which we may request.  For stop payment orders on recurring ACH transactions, you can obtain the company name of the payee from your statement by looking at a prior ACH debit from that payee that posted to your Account.  If you do not know the amount of the ACH transaction, we may still be able to place the stop payment order based on the company name of the payee (i.e. the sender of the ACH debit transaction), but this may stop all ACH items from this sender.  If you give us the wrong company name or if the sender changes the company name, we may still pay the ACH transaction without Bank having any liability to you.

Our acceptance of a stop payment order will not constitute a representation that the electronic funds transfer or ACH Transaction has not already been paid or that we have a reasonable opportunity to act upon the order.

You may generally not stop payment on an electronic funds transfer or ACH transaction after acceptance of the item by us, except as specifically allowed under NACHA Rules (defined herein) with regard to ACH transactions.

(ii)    **Notice of Varying Amounts –** If these regular payments might vary in amount and/or timing, the person you are going to pay will tell you ten (10) calendar days before each payment is due when it will be made and how much it will be. You may choose to get this notice only when the payment will differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

(iii)    **Right to Revoke Authorization for Pre-Authorized Transfers –** You may revoke your authorization for any payee to originate pre-authorized transfers from your Account by giving us written notification. You must also inform the payee in writing of your revocation. Your revocation will become binding upon us upon the last to occur of the following: (i) three (3) Business Days after we receive your written notice of revocation; or (ii) the day that we receive a copy of your written notice to the payee that your authorization has been revoked.

(iv)    **Liability for Failure to Stop Payments –** If you order us to stop one (1) of these payments three (3) Business Days or more before the transfer is scheduled, and you have given us the information we requested, including the exact amount of the payment, we will be liable if we fail to stop the payment for your losses or damages up to the amount of the payment. However, we are not liable to you for any special, incidental, exemplary, punitive or consequential losses or damages of any kind.

(v)    **Financial Institution's Liability For Failure To Make Transfers –** If we do not complete a transfer to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages up to the amount of the transfer. We are not liable to you for any special, incidental, exemplary, punitive or consequential losses or damages of any kind. However, there are some exceptions to our liability. We will not be liable, for instance:

•    If, through no fault of ours, you do not have enough money in your Account to make the transfer;

•    If the transfer would go over the credit limit on any overdraft line associated with your Account;

•    If the ATM where you are making the transfer does not have enough cash;

•    If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transfer;

•    If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transfer, despite commercially reasonable precautions that we have taken;

•    If the funds are subject to Legal Process or other encumbrance restricting the transfer;

•    If an Account becomes dormant (in which case we may terminate card or code access to that Account); or

•    If your card or code has been revoked due to inactivity or at our discretion.

There may be other exceptions, in addition to those listed above, stated in any other of our agreements with you, or as permitted by law.

(vi)    **Notices –** All notices from us will be effective when we have mailed them or delivered them to your last known address in our records. Notices from you will be effective when received by us at the telephone number or the address specified in this Agreement. We reserve the right to change the terms and conditions upon which our services are offered. We will mail notice to you at least twenty one (21) calendar days before the effective date of any change, as required by law. Use of our electronic funds transfer services is subject to existing regulations governing your Account and any future changes to those regulations.

## XI.
## IMPORTANT INFORMATION ABOUT CASH REPORTING REQUIREMENTS FOR BANKS UNDER THE BANK SECRECY ACT

Frost Bank understands that most cash transactions are legitimate and that our customers are not involved in criminal activities. However, federal laws require that we obtain specific information from you when conducting certain cash transactions. (Cash consists of currency and coin, both domestic and foreign.)

In an effort to keep you informed of important regulatory policies and requirements, we have compiled a few frequently asked questions regarding cash transactions. We value your relationship with us and hope that you find these frequently asked questions about cash reporting requirements helpful. If you have any questions on this or any other regulatory subject, please do not hesitate to call your branch or your banker.

## CASH TRANSACTIONS EXCEEDING $10,000

**Q.  Are banks required to report cash transactions over a certain amount?**

A.    Yes.  Federal law requires that all banks file a form known as a Currency Transaction Report ("CTR") whenever a customer conducts transactions greater than $10,000 in cash on any given day. This includes cash deposits or withdrawals to multiple Accounts or any combination of cash transactions (including checks cashed) by the same customer that, in total, add up to more than $10,000.

**Q.  Is this a new reporting requirement?**

A.    No.  This requirement was implemented in 1970 under the Bank Secrecy Act.  It does not in any way imply or suggest that the customer is engaging in criminal or suspicious activity. In fact, the filing of a CTR is a common, routine event.

**Q.  What information am I required to provide to the Bank to complete a CTR?**

A.    The Bank will ask you for your full name, permanent address, Social Security Number, occupation and date of birth. In addition, the Bank is required to examine and record at least one (1) form of identification. Non-resident aliens without a Social Security Number are required to provide an official document issued in their country. For cash reporting purposes, Frost Bank accepts passports and the Matricula Consular Card.

**Q.  What information is required if I send someone else to conduct the transaction for me?**

A.  In addition to the information required of you, the Bank must obtain the same information from the person conducting the transaction, except for occupation.

**Q.  What if I am conducting the transaction on behalf of my business?**

A.    The Bank must have the full name of the business, the permanent address and the federal employer identification number/Tax Identification Number. The Bank must also have the identifying information of the person conducting the transaction.

**Q.  Is there any way that I can avoid having this form completed and the transaction reported to the IRS?**

A.    No.  If you have cash exceeding $10,000, it is best to conduct the transaction and have the Bank file the required CTR. The filing of a CTR is a common and routine event for all banks. The filing of this report is in no way meant to imply or suggest that you are engaging in any illegal activity.

**Q.  Can I avoid having this form filed if I break up the transaction into smaller amounts?**

A.    It is important that you understand that attempts to avoid the filing of a CTR by breaking up a transaction into amounts under the reporting amount, behavior commonly referred to as structuring, is a violation of federal law. We recommend that you conduct the transaction and provide the Bank with the required information.

## CASH PURCHASES OF MONETARY INSTRUMENTS

**Q.  Are there other reporting requirements involving cash required by federal law?**

A.  Yes. Federal law requires all banks to obtain certain information on all cash sales of monetary instruments between $3,000 and $10,000.

**Q.  What are monetary instruments?**

A.  Monetary instruments are official checks, cashier's checks, money orders, foreign drafts, traveler's checks and certain types of gift cards and other stored value products.

**Q.  What information is the Bank required to obtain from me for this type of cash transaction?**

A.  The Bank must obtain your name, permanent address, Social Security Number, date of birth, as well as the date of transaction, the type and serial number of the instruments sold and the amount of cash involved in the transaction. The Bank is required to examine and record at least one (1) form of identification. Non-resident aliens without a Social Security Number are required to provide an official document issued in their country. For sale of monetary instruments reporting purposes, Frost Bank will accept passports and the Matricula Consular Card.

**Q.   What if I do not want to provide the Bank with this information?**

A.    The Bank has the right to refuse your transaction if you do not want to provide the required information.

**Q.   Why are banks required to obtain this information on cash transactions over $10,000 and on cash purchases of monetary instruments in the amounts of $3,000 to $10,000?**

A.    Federal laws, including the Bank Secrecy Act, require that all banks obtain this information on these types of cash and monetary instrument transactions. The purpose of the Bank Secrecy Act and other anti-money laundering laws is to help the U.S. Department of Treasury and law enforcement in their fight against criminal offenses, including money laundering and terrorist financing.

## XII.
## BUSINESS CONFIDENTIALITY STATEMENT

Since 1868, Frost Bank has recognized and respected our customers' right to confidentiality. We feel a strong commitment to rigorously safeguard and protect their financial information.

Frost Bank has established procedures mandating training and education programs to inform all employees of the need to limit access to customer records and maintain the confidentiality of these records. Access to individual identifiable records of customers is limited to employees with a valid business reason for such access. We have written procedures for providing and maintaining security for customer data and records. Physical customer records are stored in a secure location and protected by Security Procedures at all times. Strong, robust encryption technologies are used for computer-generated customer data and records. When exchanging customer information with third-party processors, we enter into confidentiality agreements with respect to customer data. We strive to meet the highest legal and ethical standards in the conduct of our business as allowed by law, observing both the letter and the spirit of the regulations surrounding the confidentiality and security of customer information.

## HOW TO CONTACT US

Telephone:   (800) 513-7678

In writing:
Frost Bank
Telephone Customer Service
P.O. Box 1600, San Antonio, TX 78296

E-mail:   webhelp@frostbank.com

If you believe your Debit Card has been lost or stolen, call us at the telephone number listed above or report your Debit Card lost or stolen online at www.frostbank.com by clicking "Account Services" and then clicking "Report a Lost or Stolen Card" under "Card Management" in Frost Online Banking.